MURPHY *v.* RAMSEY & Others.

PRATT *v.* RAMSEY & Others.

RANDALL *v.* RAMSEY & Others.

CLAWSON *v.* RAMSEY & Others.

BARLOW *v.* RAMSEY & Others.

APPEALS FROM THE SUPREME COURT OF THE TERRITORY OF UTAH.

Argued January 28, 1885.—Decided March 23, 1885.

The Board of Commissioners appointed for the Territory of Utah in pursuance of § 9 of the act of Congress approved March 22, 1882, entitled "An act to amend § 5352 of the Revised Statutes of the United States in reference to bigamy, and for other purposes," 22 Stat. 30, have no power over the registration of voters or the conduct of elections. Their authority is limited to the appointment of registration and election officers, to the canvass of the returns made by such officers of election, and to the issue of certificates of election to the persons appearing by such canvass to be elected.

The registration and election officers thus appointed are required, until other provisions be made by the Legislative assembly of the Territory, to perform their duties under the existing laws of the United States, including the act of March 22, 1882, and of the Territory, so far as not inconsistent therewith.

As the Board of Commissioners had no lawful power to prescribe conditions of registration or of voting, any rules of that character promulgated by them to govern the registration and election officers were null and void ; and as such rules could not be pleaded by the registration officers as lawful commands in justification of refusals to register persons claiming the right to be registered as voters, their illegality is no ground of liability against the Board of Commissioners.

The registration officers were bound to register only such persons as, being qualified under the laws previously in force, and offering to take the oath as to such qualifications prescribed by the territorial act of 1878, were also not disqualified by § 8 of the act of Congress of March 22, 1882.

That section provides, as to males, that no polygamist, bigamist, or any person cohabiting with more than one woman ; and, as to females, that no woman cohabiting with any polygamist, bigamist, or man cohabiting with more than one woman, shall be entitled to vote, and, consequently, no such person is entitled to be registered as a voter ; and the registration officer

must either require such disqualifications to be negatived by a modification of the oath, the form of which is given in the territorial act, or otherwise to satisfy himself by· due inquiry that such disqualifications do not exist ; but which course he is bound to adopt it is not· necessary in these cases to decide.

The plaintiffs in these actions, seeking to recover damages for being unlawfully deprived of their right to be registered as voters, must allege in their declarations, as matter of fact, that they were legally qualified voters, or, that allegation being omitted, must allege all the facts necessary to show, as matter of law, that they were qualified voters ; and to this end it is necessary that they should negative all the disqualifications pronounced by the law.

A bigamist or polygamist, in the sense of the eighth section of the act of March 22, 1882, is a man who, having contracted a bigamous or polygamous marriage, and become the husband, at one time, of two or more wives, maintains that relation and status at the time when he offers to be registered as a voter ; and this without reference to the question whether he was at any time guilty of the offence of bigamy or polygamy, or whether any prosecution for such offence was barred by the lapse of time ; neither is it necessary that he should be guilty of polygamy under the first section of the act of March 22, 1882. The eighth section of the act is not intended, and does not operate, as an additional penalty prescribed for the ·punishment of the offence of polygamy, but merely defines it as a disqualification of a voter. It is not, therefore, objectionable as an *ex post facto* law, and has no retrospective operation. The disfranchisement operates upon the existing state and condition of the person and not upon a past offence. It was accordingly, *Held—*

(1.) That, as to the five defendants below, composing the Board of Commissioners under the ninth section of the act of March 22, 1882, the demurrers were rightly sustained, and the judgments are affirmed.

(2.) That, in the cases in which Jesse J. Murphy and James M. Barlow respectively were plaintiffs, they do not allege that they were not polygamists or bigamists at the time they offered to register, although they deny that they were at that time liable to a criminal prosecution for polygamy or bigamy, and deny that they were cohabiting with more than one woman, and not showing themselves to be legally qualified voters, the judgment on the demurrers as to all the defendants is affirmed.

(3.) That, in the case in which Ellen C. Clawson, with her husband, is plaintiff, as the declaration does not deny the disqualification of one who is at the time cohabiting with a polygamist or bigamist, the judgment as to all the defendants is affirmed.

(4.) That, in the cases in which Mary Ann M. Pratt and Mildred E. Randall, with her husband, are the respective plaintiffs, as all the disqualifications are denied, and it is alleged that the defendants, the registration officers, wilfully and maliciously refused to register them as voters, the judgments as to Hoge and Lindsay in one, and as to Hoge and Harmel Pratt in the other, are reversed, and the causes remanded for further proceedings.

In these actions, five in number, Alexander Ramsey, A. S. Paddock, G. L. Godfrey, A. B. Carleton and J. R. Pettigrew, defendants in all, were persons who composed the board appointed under § 9 of the act of Congress, approved March 22, 1882, entitled "An act to amend section fifty-three hundred and fifty-two of the Revised Statutes of the United States, in reference to bigamy, and for other purposes." 22 Stat. 30. E. D. Hoge, also a defendant, in all the cases, was appointed registration officer for the county of Salt Lake, in the Territory of Utah, by that board, in pursuance of that section of the act. The other defendants, one of whom is joined in each action, to wit, Arthur Pratt, John S. Lindsay, Harmel Pratt and James T. Little, were respectively deputy registration officers in designated election precincts in which the plaintiffs in the actions severally claimed the right to be registered as voters. The object of the actions was to recover damages, alleged to have arisen by reason of the defendants wrongfully and maliciously refusing to permit the plaintiffs respectively to be registered as qualified voters in the Territory of Utah, whereby they were deprived of the right to vote at an election held in that Territory on November 7, 1882, for the election of a Delegate to the Forty-eighth Congress.

In the case in which Jesse J. Murphy is plaintiff below and appellant here, the complaint is as follows:

"The plaintiff above named complains of the defendants, and on information and belief alleges, that after the 22d day of March, 1882, and prior to the first day of July, 1882, under the provisions of section 9 of an act of the Congress of the United States, approved March 22d, 1882, and entitled 'An act to amend section 5352 of the Revised Statutes of the United States, in reference to bigamy, and for other purposes,' the President of the United States, by and with the consent of the Senate of the United States, duly appointed the defendants, Alexander Ramsey, A. S. Paddock, G. L. Godfrey, A. B. Carleton, and J. R. Pettigrew, to perform the duties mentioned in said section, to be performed by a board of five persons, and by virtue of said appointment, they became a board of five persons with the powers named in said section.

" And, on information and belief, the plaintiff alleges that, after such appointment, and prior to the first day of August, 1882, the last named five defendants, duly qualified as such appointees, came to Utah and organized as a board, and entered upon the exercise of the powers and the discharge of the duties granted and imposed by said section 9 of said act of Congress. That after said organization, said five defendants were commonly called ' commissioners,' and are hereinafter referred to and called the ' Board of Commissioners.'

" That said Board of Commissioners afterward ordered, directed and supervised a registration of the voters of the Territory of Utah, for the general election in said Territory, to be held on the seventh day of November, 1882, for the election of a Delegate for said Territory to the Forty-eighth Congress, and for such other elections as might be held prior to another registration of voters of said Territory; and on or about the 10th day of August, 1882, the said Board of Commissioners made and published rules providing for said registration, for the appointment of registration officers and judges of election, and the canvass and return of the votes; directed said registration to be made during the week commencing on the second Monday of September, 1882, and, among other rules, wilfully and maliciously made and published the following :

### ' Rule I.

There shall be appointed one registration officer for each county, and one deputy registration officer for each precinct thereof.

### ' Rule II.

' Such registration officer shall, on the second Monday of September next, proceed by himself and his deputies in the manner following: The registration officer of each county shall procure from the clerk of the county court the last preceding registry list on file in his office, and shall, by himself or his deputies, require of each person whose name is on said list, or who applies to have his name placed on said list, to take and subscribe the following oath or affirmation :

Statement of Facts.

'TERRITORY OF UTAH, ⎱ *ss* :
    *County of* ⸺ ⎰

'I, ⸺ ⸺, being first duly sworn (or affirmed), depose and say : That I am over twenty-one years of age, and have resided in the Territory of Utah for six months, and in the pre-cinct of ⸺ one month immediately preceding the date hereof, and (if a male) am a native born or naturalized (as the case may be) citizen of the United States, and a taxpayer in this Territory, (or if a female) I am native born, or naturalized, or the wife, widow or daughter (as the case may be) of a native born or naturalized citizen of the United States, and I do further solemnly swear (or affirm) that I am not a bigamist nor a polygamist ; that I am not a violater of the laws of the United States prohibiting bigamy or polygamy ; that I do not live or cohabit with more than one woman in the marriage relation, nor does any relation exist between me and any woman which has been entered into or continued in violation of the said laws of the United States prohibiting bigamy or polygamy, (and if a woman) that I am not the wife of a polygamist, nor have I entered into any relation with any man in violation of the laws of the United States concerning polygamy or bigamy.

'Subscribed and sworn to before me, this ⸺ day of ⸺ 1881.

⸺ ⸺, ,

'*Registration Officer*, ⸺ *Precinct.*

'And said registration officer, or his deputies, shall add to said lists the names of all qualified voters in such precinct whose names are not on the list, upon their taking and subscribing to the aforesaid oath, and the said registration officer shall strike from said lists the names of said persons who fail or refuse to take said oath, or have died or removed from the precinct, or are disqualified as voters under the act of Congress approved March 22d, A.D. 1882, entitled 'An act to amend section 5352 of the Revised Statutes of the United States, in reference to bigamy, and for other purposes :' *Provided*, That the action of any registration officer may be revised and reversed by this commission, upon a proper showing : *And provided, further*, That if the registration officer be unable to

procure the registration list from the office of the clerk of the county, or if the same have been lost or destroyed, the said officer and his deputies shall make a new registry list in full of all legal voters of each precinct of the county, under the provisions of these rules.'

" That said Board of Commissioners also, by rules, provided for the appointment of and appointed three judges of election for each election precinct in said Territory.

" And on information and belief, the plaintiff alleges that the defendant, E. D. Hoge, was appointed registration officer for the county of Salt Lake, in said Territory of Utah, and the defendant, Arthur Pratt, was appointed deputy registration officer for the fourth election precinct of the city of Salt Lake, in said county, and that each accepted the appointment, duly qualified, and respectively acted throughout the said registration as such registration and deputy registration officer.

" And the plaintiff alleges, that on the second Monday of September, 1882, the defendant, Arthur Pratt, as deputy registration officer for said fourth precinct in the city and county of Salt Lake, aforesaid, acting under the direction of the other defendants, commenced registering the voters of said precinct and making a registration list of such voters, and continued daily therein until the evening of Saturday of the same week, when the registration was closed.

" And the plaintiff alleges that he is a native citizen of the United States of America, and prior to the 22d day of March, 1882, was more than twenty-one years of age; that he has resided continuously in the Territory of Utah for more than eleven years, and resided continuously in the fourth precinct of Salt Lake City, in said Territory, for more than two years past; that he has, for more than ten years prior to the November election in 1882, lawfully exercised the rights and enjoyed the privileges of the elective franchise in said Territory, and has, for more than ten years last past, owned taxable property and been a tax-payer in said Territory, and that his name was on the last registration list of the voters of the second precinct, Ogden City, Weber County, Utah, made prior to the second Monday of September, 1882.

" And the plaintiff alleges that he has not, since more than three years prior to March 22, 1882, married or entered into any marriage contract or relation with any woman, or in anywise violated the act of Congress approved July 1, 1862, defining and providing for the punishment of bigamy in the Territories, and has resided continuously and openly in the counties of Weber and Salt Lake, Utah, for ten years last past, and has not violated any of the provisions of the act of Congress approved March 22, 1882, entitled 'An act to amend section 5352 of the Revised Statutes of the United States, in reference to bigamy, and for other purposes;' and that he has not, on or since the 22d day of March, 1882, cohabited with more than one woman, and has never been charged with or accused or convicted of bigamy or polygamy, or cohabiting with more than one woman, in any court or before any officer or tribunal.

" And the plaintiff alleges that on the 13th day of September, 1882, he personally went before the defendant, Arthur Pratt, then acting as deputy registration officer in and for the fourth precinct in Salt Lake City, aforesaid, and signed and presented to said defendant, and offered to verify, and requested the said defendant to take and certify plaintiff's oath to the following affidavit, to wit:

'TERRITORY OF UTAH, ⎰
    *County of Salt Lake,* ⎱ *ss*:

'I, Jesse J. Murphy, being first duly sworn, depose and say: I am over twenty-one years of age, and have continuously resided in the Territory of Utah for more than six months, to wit, for more than eleven years last past; I have resided in the fourth precinct of Salt Lake City more than six months next preceding the date hereof, and now reside therein; I am a male native born citizen of the United States of America, and a property owner and tax-payer in said Territory of Utah. I have, under the laws of the Territory of Utah, exercised the elective franchise in said Territory for more than ten years last past. I have not, within three years prior to the 22d day of March, 1882, or since, having a wife living, married another, or another woman; and I have continuously and openly re-

sided in the counties of Weber and Salt Lake, in the Territory of Utah, for more than three years prior to the 22d day of March, 1882, and I have not, on or since the 22d day of March, 1882, having a wife living, married another, or simultaneously, or on the same day, married more than one woman, or on or since said last named date married or entered into any marriage contract or relation with any woman, or cohabited with more than one woman, or in anywise violated the act of Congress entitled 'An act to amend section 5352 of the Revised Statutes of the United States, in reference to bigamy, and for other purposes,' approved March 22d, 1882. My name is on the last registry list of voters of the second precinct, Ogden City, Weber County, Utah.

'JESSE J. MURPHY.

' Subscribed and sworn to before me, this thirteenth day of September, A.D. 1882.'

"And at the same time the plaintiff requested the said defendant, Arthur Pratt, to put plaintiff's name on the registry list of voters of said precinct, and to register him as a voter therein. That the said defendant, Arthur Pratt, acting under the directions of the other defendants, wilfully and maliciously refused to receive said affidavit or to swear plaintiff thereto, or to register him as a voter of said precinct, but on the contrary wilfully and maliciously struck plaintiff's name off the list of registered voters of said precinct, and left his name off the list of voters of said precinct, made at said registration.

"That afterwards, before the close of said registration, and on the 14th day of September, 1882, the plaintiff presented a duplicate of said last-named affidavit to the defendant, E. D. Hoge, then acting as county registration officer for said county of Salt Lake, and informed him of the ruling and action as aforesaid of the defendant, Arthur Pratt, and requested the defendant, E. D. Hoge, to correct and reverse said ruling, and to instruct the defendant, Arthur Pratt, to swear plaintiff to said affidavit and register him as a voter, and the said defendant, E. D. Hoge, wilfully and maliciously refused to correct or

change said ruling and action, and approved and affirmed the same.

" That on the 16th day of September, 1882, the plaintiff presented to said Board of Commissioners a duplicate of said last-named affidavit, and informed them of the action and ruling of the defendants, Arthur Pratt and E. D. Hoge, and requested said board to reverse and correct said rulings and action, and to direct that plaintiff's oath to said affidavit be taken, and that he be registered as a voter of said precinct, and the said Board of Commissioners wilfully and maliciously refused to correct or change said rulings, and affirmed and approved the same, and said last-named ruling was made before the close of the registration in said precinct, and when there was still time for plaintiff to have registered before the close of the registration.

" And, on information and belief, the plaintiff alleges that the defendants all knew that, unless the plaintiff's name appeared on the registration list then being made of the voters of said precinct, his vote would not be received at the election to be held November 7, 1882, or at any election until after another registration of voters.

" That at an election held throughout the Territory of Utah, on the 7th of November, 1882, for the election of a Delegate for the Territory of Utah for the Forty-eighth Congress, the plaintiff went before the judges of election in said fourth precinct of the city of Salt Lake, in the county of Salt Lake, at the place where the votes in said precinct were being taken, and offered to vote at said election, and tendered and offered to take the same affidavit, but the said judges refused to receive his vote, on the ground that he was not registered as a voter in said precinct.

" And, on information and belief, the plaintiff alleges that the defendants, and each of them, intending to wrongfully deprive the plaintiff of the elective franchise in said Territory, wilfully and maliciously, by the acts and in the manner aforesaid, refused the plaintiff registration as a voter, at the said registration commenced on the second Monday of September, 1882, and deprived the plaintiff of the right to vote at the

election held in said Territory on the 7th day of November, 1882, and at all elections under said registration, whereby plaintiff has sustained damage to the amount of twelve hundred dollars.

"Wherefore the plaintiff prays judgment against the defendants for the sum of twelve hundred dollars and costs of suit."

In the case in which Mary Ann M. Pratt is plaintiff and appellant the complaint is similar in all respects, except the allegations as to her qualifications as a voter, and the contents of the affidavit which she offered to the deputy registration officer. The averments as to her qualifications are as follows:

"And the plaintiff alleges that she is a native citizen of the United States of America, and prior to the 22d day of March, 1882, was more than twenty-one years of age ; that she has resided continuously in the Territory of Utah for more than thirty years, and resided continuously in the third precinct of Salt Lake City, in said Territory, for more than two years last past; that she has, for more than five years prior to the November election in 1882, lawfully exercised the rights and enjoyed the privileges of the elective franchise in said Territory, and has, for more than five years last past, owned taxable property and been a tax-payer in said Territory, and that her name was on the last registration list of the voters of the third precinct, made prior to the second Monday of September, 1882.

"And the plaintiff alleges that she is not, and never has been, a bigamist or a polygamist ; that she is the widow of Orson Pratt, Sen., who died prior to the 22d day of March, 1882, after a continuous residence in said Territory of more than thirty years, and that since the death of her said husband she has not cohabited with any man."

The affidavit proposed by her contained the same allegations.

Alfred Randall and Mildred E. Randall, plaintiffs in another action, sue as husband and wife, in the right of the wife, for injury to her by reason of being deprived of her right to vote. The averments in the complaint as to her qualifications are as follows:

"And the plaintiffs allege that the plaintiff, Mildred E. Randall, is a native citizen of the United States of America,

and prior to the 22d day of March, 1882, was more than twenty-one years of age; that she has resided continuously in the Territory of Utah for more than twenty years, and resided continuously in the second precinct of Salt Lake City, in said Territory, for more than two years last past; that she has, for more than ten years prior to the November election in 1882, lawfully exercised the rights and enjoyed the privileges of the elective franchise in said Territory, and has, for more than five years last past, owned taxable property and been a tax-payer in said Territory, and that her name was on the last registration list of the voters of the second precinct, made prior to the second Monday of September, 1882.

"And the plaintiffs allege that the plaintiff, Mildred E. Randall, for more than three years last past, has been and is the wife of the plaintiff, Alfred Randall, who is, and prior to March 22d, 1882, was, a native born citizen of the United States of America; that she has not on or since March 22d, 1882, cohabited with any bigamist, polygamist, or with any man cohabiting with more than one woman; that she is not a bigamist or polygamist, and never has been a bigamist or polygamist, and has not in any way violated the act of Congress entitled 'An act to amend section 5352 of the Revised Statutes of the United States in reference to bigamy, and for other purposes,' approved March 22d, 1882."

The affidavit presented by her to the deputy registration officer and rejected by him contained the same allegations. In all other respects, the complaint is similar to all the others.

Hiram B. Clawson and Ellen C. Clawson also sue as husband and wife, in the wife's right, and the averments in the complaint as to her qualifications are as follows:

"And the plaintiffs allege that the plaintiff, Ellen C. Clawson, is a native citizen of the United States of America, and prior to the 22d day of March, 1882, was more than twenty-one years of age; that she has resided continuously in the Territory of Utah for more than thirty-three years, and resided continuously in the fifth precinct of Salt Lake City, in said Territory, for more than two years last past; that she has, for more than ten years prior to the November election in 1882,

lawfully exercised the rights and enjoyed the privileges of the elective franchise in said Territory, and has, for more than five years last past, owned taxable property and been a tax-payer in said Territory, and that her name was on the last registration list of the voters of said fifth precinct, made prior to the second Monday of September, 1882.

" And the plaintiffs allege that the plaintiff, Ellen C. Clawson, is not and never has been a bigamist or polygamist, and is not cohabiting and never has cohabited with any man except her husband, the co-plaintiff herein, to whom she was lawfully married more than fifteen years ago, and of whom she is the first and lawful wife.

" That the plaintiff, Hiram B. Clawson, has not married or entered into any marriage contract or relation with any woman within the last six years, and has continuously and openly resided in the City of Salt Lake, in said Territory of Utah, for more than twenty years last past."

She presented to the deputy registration officer an affidavit setting forth the same facts.

In the case in which James M. Barlow is plaintiff and appellant the averments in the complaint are altogether like those in the case of Murphy, which has been set out in full.

In each case a demurrer was filed to the complaint by all the defendants on the ground that it did not state facts sufficient to constitute a cause of action. These demurrers were sustained, and the plaintiffs electing to abide by their pleadings, judgment was rendered for the defendants, which are now brought by appeals for revision to this court.

The act of March 22, 1882, 22 Stat. 30, is as follows:

" AN ACT to amend section fifty-three hundred and fifty-two of the Revised Statutes of the United States in reference to bigamy, and for other purposes.

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section fifty-three hundred and fifty-two of the Revised Statutes of the United States be, and the same is hereby, amended so as to read as follows, namely :

"Every person who has a husband or wife living who, in a Territory or other place over which the United States have exclusive jurisdiction, hereafter marries another, whether married or single, and any man who hereafter simultaneously, or on the same day, marries more than one woman, in a Territory or other place over which the United States have exclusive jurisdiction, is guilty of polygamy, and shall be punished by a fine of not more than five hundred dollars and by imprisonment for a term of not more than five years; but this section shall not extend to any person by reason of any former marriage whose husband or wife by such marriage shall have been absent for five successive years, and is not known to such person to be living, and is believed by such person to be dead, nor to any person by reason of any former marriage which shall have been dissolved by a valid decree of a competent court, nor to any person by reason of any former marriage which shall have been pronounced void by a valid decree of a competent court, on the ground of nullity of the marriage contract.

"Sec. 2. That the foregoing provisions shall not affect the prosecution or punishment of any offence already committed against the section amended by the first section of this act.

"Sec. 3. That if any male person, in a Territory or other place over which the United States have exclusive jurisdiction, hereafter cohabits with more than one woman, he shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than three hundred dollars, or by imprisonment for not more than six months, or by both said punishments, in the discretion of the court.

"Sec. 4. That counts for any or all of the offences named in sections one and three of this act may be joined in the same information or indictment.

"Sec. 5. That in any prosecution for bigamy, polygamy, or unlawful cohabitation, under any statute of the United States, it shall be sufficient cause of challenge to any person drawn or summoned as a juryman or talesman, first, that he has been living in the practice of bigamy, polygamy, or unlawful cohabitation with more than one woman, or that he is or has been guilty of an offence punishable by either of the foregoing sections,

or by section fifty-three hundred and fifty-two of the Revised Statutes of the United States, or the act of July first, eighteen hundred and sixty-two, entitled 'An Act to punish and prevent the practice of polygamy in the Territories of the United States and other places, and disapproving and annulling certain acts of the Legislative Assembly of the Territory of Utah;' or, second, that he believes it right for a man to have more than one living and undivorced wife at the same time, or to live in the practice of cohabiting with more than one woman; and any person appearing or offered as a juror or talesman, and challenged on either of the foregoing grounds, may be questioned on his oath as to the existence of any such cause of challenge, and other evidence may be introduced bearing upon the question raised by such challenge; and this question shall be tried by the court. But as to the first ground of challenge beforementioned, the person challenged shall not be bound to answer if he shall say upon his oath that he declines on the ground that his answer may tend to criminate himself; and if he shall answer as to said first ground, his answer shall not be given in evidence in any criminal prosecution against him for any offence named in sections one or three of this act, but if he declines to answer on any ground, he shall be rejected as incompetent.

"SEC. 6. That the President is hereby authorized to grant amnesty to such classes of offenders guilty of bigamy, polygamy, or unlawful cohabitation, before the passage of this act, on such conditions and under such limitations as he shall think proper; but no such amnesty shall have effect unless the conditions thereof shall be complied with.

"SEC. 7. That the issue of bigamous or polygamous marriages, known as Mormon marriages, in cases in which such marriages have been solemnized according to the ceremonies of the Mormon sect, in any Territory of the United States, and such issue shall have been born before the first day of January, Anno Domini eighteen hundred and eighty-three, are hereby legitimated.

"SEC. 8. That no polygamist, bigamist, or any person cohabiting with more than one woman, and no woman cohabiting with any of the persons described as aforesaid in this section,

in any Territory or other place over which the United States have exclusive jurisdiction, shall be entitled to vote at any election held in any such Territory or other place, or be eligible for election or appointment to or be entitled to hold any office or place of public trust, honor or emolument, in, under, or for any such Territory or place, or under the United States.

"SEC. 9. That all the registration and election offices of every description in the Territory of Utah are hereby declared vacant, and each and every duty relating to the registration of voters, the conduct of elections, the receiving or rejection of votes, and the canvassing and returning of the same, and the issuing of certificates or other evidence of election in said Territory, shall, until other provisions be made by the Legislative Assembly of said Territory as is hereinafter by this section provided, be performed under the existing laws of the United States and of said Territory by proper persons, who shall be appointed to execute such offices and perform such duties by a board of five persons, to be appointed by the President, by and with the advice and consent of the Senate, not more than three of whom shall be members of one political party ; and a majority of whom shall be a quorum. The members of said board so appointed by the President shall each receive a salary at the rate of three thousand dollars per annum, and shall continue in office until the Legislative Assembly of said Territory shall make provision for filling said offices as herein authorized. The secretary of the Territory shall be the secretary of said board, and keep a journal of its proceedings, and attest the action of said board under this section. The canvass and return of all the votes at elections in said Territory for members of the Legislative Assembly thereof shall also be returned to said board, which shall canvass all such returns and issue certificates of election to those persons who, being eligible for such election, shall appear to have been lawfully elected, which certificates shall be the only evidence of the right of such persons to sit in such Assembly : *Provided*, That said board of five persons shall not exclude any person otherwise eligible to vote from the polls on account of any opinion such person may entertain on the subject of bigamy or polygamy, nor shall they

refuse to count any such vote on account of the opinion of the person casting it on the subject of bigamy or polygamy; but each House of such Assembly, after its organization, shall have power to decide upon the elections and qualifications of its members. And at or after the first meeting of said Legislative Assembly, whose members shall have been elected and returned according to the provisions of this act, said Legislative Assembly may make such laws, conformable to the organic act of said Territory and not inconsistent with other laws of the United States, as it shall deem proper, concerning the filling of the offices in said Territory declared vacant by this act."

§ 5352 of the Revised Statutes, which the foregoing act amends, reads as follows: "Every person having a husband or wife living who marries another, whether married or single, in a Territory, or other place over which the United States have exclusive jurisdiction, is guilty of bigamy, and shall be punished by a fine of not more than five hundred dollars, and by imprisonment for a term not more than five years; but this section shall not extend to any person by reason of any former marriage whose husband or wife by such marriage is absent for five successive years and is not known to such person to be living, nor to any person by reason of any former marriage which has been dissolved by decree of a competent court, nor to any person by reason of any former marriage which has been pronounced void by decree of a competent court on the ground of nullity of the marriage contract."

At the time of the passage of the act of March 22, 1882, the qualifications of voters prescribed by the Territorial Legislature, whose right to do so was conferred by the organic act of Utah, were as follows: If males, they were required to be citizens of the United States, over twenty-one years of age, and constant residents in the Territory during the six months next preceding the election, and no person was to be deemed a resident unless he was a tax-payer in the Territory; if females, they were required to be of the age of twenty-one years, resident in the Territory six months next preceding the election, and born or naturalized in the United States, or the wife, widow or daughter of a native born or naturalized citizen of

the United States. Act to establish a territorial government for Utah, approved September 9, 1850, 9 Stat. 453; Comp. Laws of Utah, 1876, p. 88.

At the same time there was also in force ch. 12 of the laws of Utah, 1878, providing for the registration of voters and to further regulate the manner of conducting elections in that Territory.

That act contains the following provisions:

" That the assessors in their respective counties are hereby constituted the registration officers, and they are required to appoint a resident deputy in each precinct to assist in carrying out the provisions of this act, and before the first Monday in June, 1878, in person or by deputy, they shall visit every dwelling in each precinct, and make careful inquiry as to any or all persons entitled to vote, and each assessor or deputy, in all cases, shall ascertain upon what ground such person claims to be a voter, and he shall require each person entitled to vote and desiring to be registered to take and subscribe in substance the following oath or affirmation:

'TERRITORY OF UTAH; ⎱ *ss* :
   ' *County* ———, ⎰

' I, ———, being first duly sworn, depose and say that I am over twenty-one years of age and have resided in the Territory of Utah for six months, and in the precinct of ——— one month next preceding the date hereof, and (if a male) am a (" native born," or " naturalized," as the case may be) citizen of the United States, and a tax-payer in this Territory ; (or, if a female,) I am " native born," or " naturalized," or the " wife," " widow," or " daughter" (as the case may be) of a native born or naturalized citizen of the United States.

' Subscribed and sworn to before me this — day ———, A.D. 18—.

'   ———, *Assessor.*'

" Upon the receipt of such affidavit, the assessor as aforesaid shall place the name of such voter upon the register list of the voters of the county.

"SEC. 2. It shall also be the duty of the assessor of each county, in person or by deputy, at the time of making the annual assessment for taxes in each year, beginning in 1879, to take up the transcript for the next preceding registration list and proceed to the revision of the same, and for this purpose he shall visit every dwelling-house in each precinct, and make careful inquiry if any person whose name is on his list has died, or removed from the precinct, or is otherwise disqualified as a voter of such precinct, and if so, to erase the same therefrom, or whether any qualified voter resides therein whose name is not on his list, and if so, to add the same thereto, in the manner as provided in the preceding section.

"SEC. 3. It shall also be the duty of each assessor, in person, or by deputy, during the week commencing the first Monday in June of each year, at his office, to enter on his registry list the name of any voter that may have been omitted, on such voter appearing and complying with the provision of the first section of this act required of voters for registration purposes.

"SEC. 4. Upon the completion of the list, it shall be the duty of each assessor as aforesaid to proceed to make out a list in alphabetical order, for each precinct, containing the names of all the registered voters of such precinct, and shall, on or before the first day of July in each year, deliver all of said lists and affidavits to the clerk of the county court.

"SEC. 5. The clerk of the county court shall deliver to the assessor the registry lists whenever necessary for the revision thereof, or adding names thereto, and the assessor in person or by deputy shall, during the week commencing the second Monday in September in the year 1878, and every second year thereafter, enter names of voters on the registry list in the manner provided in section three of this act, and upon the list being completed, proceed as required by section four of this act: *Provided,* That in such case he shall deliver the list and affidavits on or before the 10th day of October in such year.

"SEC. 6. Voters removing from one election precinct to another in the same county may appear before the assessor at any time previous to the delivery of the registry list to the clerk of the county court, and have their names erased there-

from, and they may thereupon have their names registered in the precinct to which they may remove.

" Sec. 7. The clerk of the county court shall file and carefully preserve all said affidavits and registry lists, and shall make a copy of each precinct registry list, and cause the same to be posted up at least fifteen days before any election, at or near the place of election, and shall make and transmit another copy to the judges of election.

" Sec. 8. The clerk of the county court shall cause to be printed or written a notice, which shall designate the offices to be filled, and stating that the election will commence at ——, [designating the place for holding the polls,] one hour after sunrise, and continue till sunset on the — day of ——, 18—, [naming the day of election.] Dated at ——, A. D. 18—.

———, *Clerk of the County Court.*

" A copy of which shall be posted up at least fifteen days before the election, in three public places in said precinct best calculated to give notice to all the voters. It shall also be the duty of the clerk of the county court to give notice on the lists so posted that the senior justices of the peace for said precinct will hear objections to the right to vote of any person registered until sunset of the fifth day preceding the day of election. Said objections shall be made by a qualified voter, in writing, and delivered to the said justice, who shall issue a written notice to the person objected to, stating the place, day, and hour when the objection will be heard. The person making the objection shall serve, or cause to be served, said notice upon the person objected to, and shall also make returns of such service to the justice before whom the objection shall be heard. Upon the hearing of the case, if said justice shall find that the person objected to is not a qualified voter, he shall, within three days prior to the election, transmit a certified list of the names of all such unqualified persons to the judges of election, and said judges shall strike such names from the registry list before the opening of the polls.

" Sec. 9. The county court shall, at its first session in June of each year, appoint three capable and discreet persons in each precinct in the county, one at least of whom shall be of

the political party that was in the minority at the last previous election, if any such party there be in such precinct, to act as judges of general and special elections; and they shall designate one of the persons appointed to preside, and the other two to act as clerks of said elections. And the clerk of said court shall make out certificates of said appointments, and transmit the same by mail or other safe conveyance to the persons so appointed, who, previous to entering upon said office, shall take and subscribe an oath to the effect that they will well and faithfully perform all the duties thereof to the best of their ability, and that they will studiously endeavor to prevent any fraud, deceit, or abuse at any election over which they may preside. If, in any precinct, any of such judges decline to serve or fail to appear, the voters of said precinct, first assembled on the day of election, to the number of six, at or immediately after the time designated for opening the polls, may elect a judge or judges to fill the vacancy, and the persons so elected shall qualify as hereinbefore provided."

Sections 10 and 11 prescribe how ballot-boxes, keys, &c., shall be procured, and provide for envelopes and ballots, an l for keeping the boxes during the voting and until the canvass; and section 12 provides how the judges shall keep the lists, &c.

"Sec. 13. Every voter shall designate on a single ballot, written or printed, the name of the person or persons voted for, with a pertinent designation of the office to be filled, and when any question is to be decided in the affirmative or negative, he shall state the proposition at the bottom of the ballot, and write thereunder yes or no, as he may desire to vote thereon, which ballot shall be neatly folded and placed in one of the envelopes hereinbefore provided for, and delivered to the presiding judge of election, who shall, in the presence of the voter, on the name of the proposed voter being found on the registry list, and on all challenges to such vote being decided in favor of such voter, deposit it in the ballot-box, without any mark whatever being placed on such envelope; otherwise the ballot shall be rejected."

The remainder of the act relates to the canvass, returns, and certificates of election.

*Mr. George G. Vest* and *Mr. Wayne McVeigh* for appellants.

*Mr. Solicitor-General* for appellees.

Mr. Justice Matthews, after making the foregoing statement, delivered the opinion of the court.

These cases, although actions at law, were not tried by jury; and, therefore, are rightly brought here by appeal, according to the provision of the act of Congress of April 7, 1874, 18 Stat. 27. *Stringfellow* v. *Cain*, 99 U. S. 610; *Hecht* v. *Boughton*, 105 U. S. 235; *Woolf* v. *Hamilton*, 108 U. S. 15.

The wrong complained of in each case by the respective plaintiffs is, "that the defendants, and each of them, intending to wrongfully deprive the plaintiff of the elective franchise in said Territory, wilfully and maliciously, by the acts and in the manner aforesaid, refused the plaintiff registration, as a voter, at the said registration commenced on the second Monday of September, 1882, and deprived the plaintiff of the right to vote at the election held in said Territory on the 7th day of November, 1882, and at all elections under said registration."

The acts which, it is alleged, were done by the five defendants, as a Board of Commissioners or Canvassers, under the law of March 22, 1882, and which contributed to the wrong, and constituted part of it, are, that they prescribed as a condition of registration an unauthorized oath, set out in the complaint, in a rule promulgated by them for the government of the registration officers; and that the deputy registration officer having, in obedience to such rule, "acting under the directions of the other defendants," wilfully and maliciously refused to receive the affidavit tendered by the plaintiff, in lieu of that prescribed by the rule of the board, and to register the plaintiff; and that the county registration officer, on appeal, having refused to order otherwise, the Board of Commissioners also refused to reverse and correct these rulings and to direct the registration of the plaintiffs respectively, but affirmed and approved the same.

But an examination of the ninth section of the act of March 22, 1882, providing for the appointment and prescribing the

duties and powers of that board, shows that they have no functions whatever in respect to the registration of voters, except the appointment of officers, in place of those previously authorized, whose offices are by that section of the law declared to be vacant; and the persons appointed to succeed them are not subject to the direction and control of the board, but are required, until other provision be made by the legislative assembly of the Territory, to perform all the duties relating to the registration of voters, "under the existing laws of the United States and of said Territory." The board are not authorized to prescribe rules for governing them in the performance of these duties, much less to prescribe any qualifications for voters as a condition of registration. The statutory powers of the board are limited to the appointment of the registration and election officers, authorized to act in the first instance under the law until provision is made by the Territorial Legislature for the appointment of their successors, and to the canvass of the returns and the issue of certificates of election "to those persons who, being eligible for such election, shall appear to have been lawfully elected." The proviso in the section does indeed declare "that said board of five persons shall not exclude any person otherwise eligible to vote from the polls on account of any opinion such person may entertain on the subject of bigamy or polygamy;" but, in the absence of any general and express power over the subject of declaring the qualification of voters, it is not a just inference, from the words of this proviso, that it was intended to admit by implication the existence of any authority in the board to exclude from registration or the right to vote, any person whatever, or in any manner to define and declare what the qualifications of a voter shall be. The prohibition against excluding any person from the polls, for the reason assigned, must be construed, with the additional injunction, "nor shall they refuse to count any such vote on account of the opinion of the person casting it on the subject of bigamy or polygamy," to apply to the action of the board in canvassing the returns of elections, made to them by the officers holding such elections; or, if it includes more, it is to be taken as the announcement of a general prin-

ciple to govern all officers concerned in the registration of voters or the conduct of elections.

It follows that the rules promulgated by the board, prescribing the form of oath to be exacted of persons offering to register as voters, and which constitute the directions under which it is alleged the registration officers acted, were without force, and no effect can be given to them. It cannot be alleged that they had the effect in law of preventing the registration of the plaintiffs, for the registration officers were not bound to obey them; and if they did so, they did it in their own wrong. There was no relation between the board and the officers appointed by them of principal and agent, so as to make the members of the former liable for what the latter may have illegally done under their instructions, and, therefore, no connection in law between the acts of the board as charged and the wrongs complained of.

The judgment in favor of the defendants, composing the Board of Commissioners, upon their demurrer, therefore, was rightly rendered.

The cases, as to the other defendants, the registration officers, stand on different principles. If they were merely ministerial officers, and if they have deprived the respective plaintiffs of their right to be registered as voters, in violation of law, they may be responsible in an action for damages. Whether they are so must depend, in the first instance, not upon what they have done or omitted, but upon the question whether the plaintiffs have severally shown themselves entitled to the right of which, it is alleged, they were illegally deprived.

And in entering upon the consideration of this point it is to be observed, in the first place, that the pleader has not in any of the complaints, alleged, as matter of fact, that the plaintiff was a legally qualified voter, entitled to be registered as such. He has preferred, in each case, with variations to suit the circumstances, to aver the existence of specific enumerated qualifications, and the absence of specific and enumerated disqualifications, leaving it to be inferred, as a matter of law, that the plaintiff was a legally qualified voter and entitled to be registered as such. That legal inference is necessary to com-

plete the case as stated; and the sufficiency of the statement must depend on whether all the positive qualifications required by law are alleged to have existed, and all the disqualifications affixed by law have been negatived.

To ascertain this we have to compare the allegations of the complaint in each case with the requisitions of the law, and, by construction, to determine whether they conform.

So far as the requirements of the law existing at the time of the passage of the act of March 22, 1882, and which continued in force concurrently with that, are concerned, there is no difficulty. Each of the plaintiffs is shown to have been a qualified voter, unless disqualified by the latter act. The only question is, whether they have brought themselves within the meaning of that act. The language on which the questions arise occurs in § 8, and is: "That no polygamist, bigamist, or any person cohabiting with more than one woman, and no woman cohabiting with any of the persons described as aforesaid in this section," &c., that is, with any polygamist, bigamist, or person cohabiting with more than one woman, shall be entitled to vote at any election held in the Territory.

In the case in which Mary Ann M. Pratt is plaintiff, she clearly excludes herself from the disqualifications of the act. She alleges in her complaint "that she is not and never has been a bigamist or polygamist; that she is the widow of Orson Pratt, Sen., who died prior to the 22d day of March, 1882, after a continuous residence in said Territory of more than thirty years, and that since the death of her said husband she has not cohabited with any man."

The same is true in reference to the allegations of the complaint in the case in which Mildred E. Randall and her husband are plaintiffs. They are, "that the plaintiff, Mildred E. Randall, for more than three years last past has been and is the wife of the plaintiff, Alfred Randall, who is and prior to March 22d, 1882, was a native-born citizen of the United States of America; that she has not on or since March 22d, 1882, cohabited with any bigamist, polygamist, or with any man cohabiting with more than one woman; that she is not a bigamist or polygamist, and never has been a bigamist or polygamist,

and has not in any way violated the act of Congress entitled
' An Act to amend section 5352 of the Revised Statutes of the
United States in reference to bigamy, and for other purposes,'
approved March 22d, 1882."

The requirements of the eighth section of the act, in refer
ence to a woman claiming the right to vote, are that she does
not, at the time she offers to register, cohabit with a polyg-
amist, bigamist or person cohabiting with more than one
woman; and it is sufficient, if the complaint denies the dis-
qualification in the language of the act. These requirements
are fully met in the two cases just referred to.

The case of Ellen C. Clawson is different. In the complaint,
filed by herself and her husband, it is alleged that she " is not
and never has been a bigamist or polygamist, and is not co-
habiting and never has cohabited with any man except her
husband, the co-plaintiff herein, to whom she was lawfully mar-
ried more than fifteen years ago, and of whom she is the first
and lawful wife; that the plaintiff, Hiram B. Clawson, has not
married or entered into any marriage contract or relation with
any woman within the last six years, and has continuously and
openly resided in the city of Salt Lake, in said Territory of
Utah, for more than twenty years last past."

It is quite consistent with these statements, that the husband
of the female plaintiff was, at the time she claimed registration,
a bigamist, or a polygamist, or that he was then cohabiting
with more than one woman ; and that she was cohabiting with
him at the same time. She would be, on either supposition,
expressly disqualified from voting by the eighth section of the
act of March 22, 1882, and she does not negative the fact. It
cannot, therefore, be inferred that she was a lawfully qualified
voter.

The cases of Murphy and Barlow are alike in substance. In
Murphy's case, the allegations are, " that he has not since more
than three years prior to March 22d, 1882, married or entered
into any marriage contract or relation with any woman, or in
anywise violated the act of Congress approved July 1, 1862,
defining and providing for the punishment of bigamy in the
Territories, . . . and has not violated any of the provisions

of the act of Congress approved March 22d, 1882, &c., . . . and that he has not, on or since the 22d day of March, 1882, cohabited with more than one woman, and has never been charged with or accused or convicted of bigamy or polygamy, or cohabiting with more than one woman, in any court or before any officer or tribunal." In Barlow's case, the statement on one point is stronger. It is, "that he has not, on or since the first day of July, 1862, married or entered into any marriage contract or relation with any woman, or in anywise violated the act of Congress approved July 1, 1862, defining and providing for the punishment of bigamy in the Territories." That is to say, that, although he may have married a second wife, it was before any law existed in the Territory prohibiting it, and, therefore, it could not have been a criminal offence when committed.

But in both cases the complaints omit the allegation, that, at the time the plaintiffs respectively claimed to be registered as voters, they were not each, either a bigamist or a polygamist. It is admitted that the use of these very terms in the complaint is not necessary, if the disqualifications lawfully implied by them are otherwise substantially denied. That such is their case is maintained by the appellants.

The words "bigamist" and "polygamist" evidently are not used in this statute in the sense of describing those who entertain the opinion that bigamy and polygamy ought to be tolerated as a practice, not inconsistent with the good order of society, the welfare of the race, and a true code of morality, if such there be; because, in the proviso in the ninth section of the act, it is expressly declared that no person shall be excluded from the polls, or be denied his vote, on account of any opinion on the subject.

It is argued that they cannot be understood as meaning those who, prior to the passage of the act of March 22, 1882, had contracted a bigamous or polygamous marriage, either in violation of an existing law, such as that of July 1, 1862, or before the enactment of any law forbidding it; for to do so would give to the statute a retrospective effect, and by thus depriving citizens of civil rights, merely on account of past

offences, or on account of acts which when committed were not offences, would make it an *ex post facto* law, and therefore void. And the conclusion is declared to be necessary, that the words polygamist and bigamist, as used in § 8 of the act, can mean only such persons as having violated the first section of the act, are guilty of polygamy; that is, "every person who has a husband or wife living, who, in a Territory or other place over which the United States have exclusive jurisdiction, hereafter marries another, whether married or single, and any man who hereafter simultaneously or on the same day marries more than one woman, in a Territory or other place over which the United States have exclusive jurisdiction."

But there is another meaning which may be given to these words, which, we think, is the one intended by Congress. In our opinion, any man is a polygamist or bigamist, in the sense of this section of the act, who, having previously married one wife, still living, and having another at the time when he presents himself to claim registration as a voter, still maintains that relation to a plurality of wives, although from the date of the passage of the act of March 22, 1882, until the day he offers to register and to vote, he may not in fact have cohabited with more than one woman. Without regard to the question whether at the time he entered into such relation it was a prohibited and punishable offence, or whether by reason of lapse of time since its commission a prosecution for it may not be barred, if he still maintains the relation, he is a bigamist or polygamist, because that is the status which the fixed habit and practice of his living has established. He has a plurality of wives, more than one woman whom he recognizes as a wife, of whose children he is the acknowledged father, and whom with their children he maintains as a family, of which he is the head. And this status as to several wives may well continue to exist, as a practical relation, although for a period he may not in fact cohabit with more than one; for that is quite consistent with the constant recognition of the same relation to many, accompanied with a possible intention to renew cohabitation with one or more of the others when it may be convenient.

It is not, therefore, because the person has committed the offence of bigamy or polygamy, at some previous time, in violation of some existing statute, and as an additional punishment for its commission, that he is disfranchised by the act of Congress of March 22, 1882; nor because he is guilty of the offence, as defined and punished by the terms of that act; but, because, having at some time entered into a bigamous or polygamous relation, by a marriage with a second or third wife, while the first was living, he still maintains it, and has not dissolved it, although for the time being he restricts actual cohabitation to but one. He might in fact abstain from actual cohabitation with all, and be still as much as ever a bigamist or a polygamist. He can only cease to be such when he has finally and fully dissolved in some effective manner, which we are not called on here to point out, the very relation of husband to several wives, which constitutes the forbidden status he has previously assumed. Cohabitation is but one of the many incidents to the marriage relation. It is not essential to it. One man, where such a system has been tolerated and practised, may have several establishments, each of which may be the home of a separate family, none of which he himself may dwell in or even visit. The statute makes an express distinction between bigamists and polygamists on the one hand, and those who cohabit with more than one woman on the other; whereas, if cohabitation with several wives was essential to the description of those who are bigamists or polygamists, those words in the statute would be superfluous and unnecessary. It follows, therefore, that any person having several wives is a bigamist or polygamist in the sense of the act of March 22, 1882, although since the date of its passage he may not have cohabited with more than one of them.

Upon this construction the statute is not open to the objection that it is an *ex post facto* law. It does not seek in this section and by the penalty of disfranchisement to operate as a punishment upon any offence at all. The crime of bigamy or polygamy consists in entering into a bigamous or polygamous marriage, and is complete when the relation begins. That of actual cohabitation with more than one woman is defined and

the punishment prescribed in the third section. The disfranchisement operates upon the existing state and condition of the person, and not upon a past offence. It is, therefore, not retrospective. He alone is deprived of his vote who, when he offers to register, is then in the state and condition of a bigamist or a polygamist, or is then actually cohabiting with more than one woman. Disfranchisement is not prescribed as a penalty for being guilty of the crime and offence of bigamy or polygamy; for, as has been said, that offence consists in the fact of unlawful marriage, and a prosecution against the offender is barred by the lapse of three years, by § 1044 of the Revised Statutes. Continuing to live in that state afterwards is not an offence, although cohabitation with more than one woman is. But as one may be living in a bigamous or polygamous state without cohabitation with more than one woman, he is in that sense a bigamist or a polygamist, and yet guilty of no criminal offence. So that, in respect to those disqualifications of a voter under the act of March 22, 1882, the objection is not well taken that represents the inquiry into the fact by the officers of registration as an unlawful mode of prosecution for crime. In respect to the fact of actual cohabitation with more than one woman, the objection is equally groundless, for the inquiry into the fact, so far as the registration officers are authorized to make it, or the judges of election, on challenge of the right of the voter if registered, are required to determine it, is not, in view of its character as a crime, nor for the purpose of punishment, but for the sole purpose of determining, as in case of every other condition attached to the right of suffrage, the qualification of one who alleges his right to vote. It is precisely similar to an inquiry into the fact of nativity, of age, or of any other status made necessary by law as a condition of the elective franchise. It would be quite competent for the sovereign power to declare that no one but a married person shall be entitled to vote; and in that event the election officers would be authorized to determine for that occasion, in case of question in any instance, upon the fact of marriage as a continuing status. There is no greater objection, in point of law, to a similar inquiry for the like purpose into the fact of a sub-

sisting and continuing bigamous or polygamous relation, when it is made, as by the statute under consideration, a disqualification to vote.

The counsel for the appellants in argument seem to question the constitutional power of Congress to pass the act of March 22, 1882, so far as it abridges the rights of electors in the Territory under previous laws. But that question is, we think, no longer open to discussion. It has passed beyond the stage of controversy into final judgment. The people of the United States, as sovereign owners of the National Territories, have supreme power over them and their inhabitants. In the exercise of this sovereign dominion, they are represented by the government of the United States, to whom all the powers of government over that subject have been delegated, subject only to such restrictions as are expressed in the Constitution, or are necessarily implied in its terms, or in the purposes and objects of the power itself; for it may well be admitted in respect to this, as to every power of society over its members, that it is not absolute and unlimited. But in ordaining government for the Territories, and the people who inhabit them, all the discretion which belongs to legislative power is vested in Congress; and that extends, beyond all controversy, to determining by law, from time to time, the form of the local government in a particular Territory, and the qualification of those who shall administer it. It rests with Congress to say whether, in a given case, any of the people, resident in the Territory, shall participate in the election of its officers or the making of its laws; and it may, therefore, take from them any right of suffrage it may previously have conferred, or at any time modify or abridge it, as it may deem expedient. The right of local self-government, as known to our system as a constitutional franchise, belongs, under the Constitution, to the States and to the people thereof, by whom that Constitution was ordained, and to whom by its terms all power not conferred by it upon the government of the United States was expressly reserved. The personal and civil rights of the inhabitants of the Territories are secured to them, as to other citizens, by the principles of constitutional liberty which restrain all the agencies of gov-

ernment, State and National; their political rights are fran-
chises which they hold as privileges in the legislative discretion
of the Congress of the United States. This doctrine was fully
and forcibly declared by the Chief Justice, delivering the opinion
of the court in *National Bank* v. *County of Yankton*, 101 U. S.
129. See also *American Ins. Co.* v. *Canter*, 1 Pet. 511; *United
States* v. *Gratiot*, 14 Pet. 526; *Cross* v. *Harrison*, 16 How.
164; *Dred Scott* v. *Sandford*, 19 How. 393. If we concede
that this discretion in Congress is limited by the obvious pur-
poses for which it was conferred, and that those purposes are
satisfied by measures which prepare the people of the Terri-
tories to become States in the Union, still the conclusion cannot
be avoided, that the act of Congress here in question is clearly
within that justification. For certainly no legislation can be
supposed more wholesome and necessary in the founding of a
free, self-governing commonwealth, fit to take rank as one of
the co-ordinate States of the Union, than that which seeks to
establish it on the basis of the idea of the family, as consisting
in and springing from the union for life of one man and one
woman in the holy estate of matrimony; the sure foundation of
all that is stable and noble in our civilization; the best guar-
anty of that reverent morality which is the source of all benef-
icent progress in social and political improvement. And to
this end, no means are more directly and immediately suitable
than those provided by this act, which endeavors to withdraw
all political influence from those who are practically hostile to
its attainment.

It remains to be considered whether, in the two cases in
which Mary Ann M. Pratt and Mildred E. Randall and hus-
band are respectively the plaintiffs, and in which the plaintiffs
have shown a title to vote, the defendants who were registra-
tion officers, are sufficiently charged with a legal liability.

As we have pointed out, they are bound by virtue of
their appointment under § 9 of the act of March 22, 1882,
to perform their duties under the existing laws of the United
States and of the Territory. The law of the Territory then
in force, being "An Act providing for the registration of
voters and to further regulate the manner of conducting elec-

tions in this Territory," approved February 22, 1878, made it the duty of the registration officers and their deputies " to make careful inquiry as to any or all persons entitled to vote," and ascertain in all cases upon what ground the person claims to be a voter, and it is provided that " he shall require each person entitled to vote and desiring to be registered to take and subscribe in substance the following oath," &c. The form of the oath is then set out, containing a statement of all the particulars which, according to the laws then in force, were necessary to show the qualifications of a voter. It was then provided, that, upon the receipt of such affidavit, the officer " shall place the name of such voter upon the register list of the voters of the county."

The act of March 22, 1882, created the additional disqualifications which have been mentioned, and which, of course, are not met by the oath as prescribed by the territorial act of 1878, and it is not consistent with the express provisions of the act of Congress, that every person willing to take the oath in the form prescribed by the territorial act shall be permitted to register as a voter. Either the oath itself must be regarded merely as a model, to be modified by the operation of the act of Congress, so as to meet by appropriate denials the several new disqualifications created by it, and then to be taken with the prescribed effect of entitling the person subscribing it to register as a voter without other proof; or else the effect of the act of Congress is to limit the class entitled to take the oath in the form prescribed by the territorial act, with the effect thereby given to it, to those who are not subject to the disqualifications which the act of Congress imposes. The existing laws of the United States and of the Territory, under which the election officers are bound to perform their duties, must include the act itself, which provides for their appointment and defines their duties, and if they have not the right to exact an oath different from that, the form of which is given in the territorial act, they must otherwise satisfy themselves that persons offering to register are free from the disqualifications defined in the act of Congress. In doing so, they are of course required to exercise diligence and good faith in their inquiries,

and are responsible in damages for rejections made without reasonable cause, or maliciously.

In the two cases last referred to, the allegations of the complaint show, not only that the several plaintiffs were legally entitled to be registered as voters, but declared that the refusal of the registration officers to admit them to the list was wrongful and malicious. The demurrers admit the plaintiffs' case, as thus stated, and therefore ought to have been overruled.

*It follows that the judgments in the three cases in which Jesse J. Murphy, Ellen C. Clawson and Hiram B. Clawson, her husband, and James M. Barlow are the respective plaintiffs, are affirmed as to all the defendants; in the two cases in which Mary Ann M. Pratt and Mildred E. Randall, and Alfred Randall, her husband, are the plaintiffs respectively, the judgments in favor of the five defendants, Alexander Ramsey, A. S. Paddock, G. L. Godfrey, A. B. Carleton and J. R. Pettigrew, are affirmed; and as to the defendants, E. D. Hoge, John S. Lindsay and Harmel Pratt, the judgments are reversed, and as to them the cases are remanded, with instructions to overrule the demurrers, and for further proceedings. And it is so ordered.*