# THE UNITED STATES, RESPONDENT, v. ANGUS M. CANNON, APPELLANT.

## AFFIRMED: 116 U. S., 55.

CRIMINAL LAW.—INDICTMENT.—UNLAWFUL COHABITATION.—An indictment for the offence created by section 3 of the Act of Congress of March 22, 1882, Ch. 47, 22 Stat. 31, need not state that the defendant is a *male person*, even if the defendant's name be not a distinctively masculine name. It is presumed that the defendant is charged as a male person, when he is charged with an offence which could only be committed by such a person.

ID.—STATUTORY OFFENCE.—In an indictment for an offence created by statute it is sufficient to describe the offence in the language of the statute. So in an indictment under section 3 of the act above referred to it is unnecessary to allege that the cohabitation charged therein was in the marital relation, although said section was only intended to apply to unlawful matrimonial cohabitation.

ID.—EVIDENCE.—SEXUAL INTERCOURSE,—The offence of cohabiting with more than one woman created by said section 3, is committed by a man who so associates with two women as to hold them out to the world as his wives, and it is not essential to the commission of such offence that he should have sexual intercourse with either of them.

ID.—INSTRUCTIONS.—IMMATERIAL OR MISLEADING.—Certain requests for instructions, stated in the opinion, held to be properly refused.

APPEAL from a judgment of the district court of the third district, and from an order refusing a new trial. The facts are stated in the opinion of the court.

*Messrs. Sutherland & McBride,* for appellant.

*The indictment is bad for the reason that it does not state a case including all the elements of the offense defined in the third section of the Edmunds act.*

We invoke the rule, which is settled beyond all controversy, that an indictment must allege all the facts necessary to fill every particular of the statutory or common law definition of the offense sought to be charged: 1 Am. Cr. L. Secs. 285, 288; 1 Bish. on Cr. Pr., Secs. 326, 508, 517,

521; Bish. on St. Cr., Sec, 612, and note; 1 Arch. Cr. Pl. and Pr., 86 note; *State* v. *McKenzie*, 42 Me., 392: *Koster* v. *People*, 8 Mich., 431; *Enders* v. *People*, 20 id, 233; *Palmer* v. *People*, 43 id, 417; *Wood* v. *People*, 53 N. Y., 511; *People* v, *Allen*, 5 Denio, 79; *Brown* v. *Commonwealth*, 8 Mass., 65.

Under the head first stated, we rely on two defects of the indictment.

1. It fails to allege that defendant is a "male person."

Where the offence consists of an act done by a person of a particular description, the indictment must allege that the defendant is a person of that description: *People* v. *Allen*, 5 Denio, 79; *Ex Parte Hedley*, 31 Cal., 108;. *Commonwealth* v. *Libby*, 11 Met., 64; *King* v. *John*, 3 M. and S. 548. -

2. The indictment does not allege that the defendant put forth any pretense of marital relation to the women therein mentioned.

The third section denounces all cohabitation of a male person with more than one woman. To confine it to a cohabitation with them, under a claim of marriage, the court must interpolate words which the lawmaker has not inserted. This court has held that it is not competent so to interpret and change a statute: *Logan City* v. *Buck*, 3 Utah 301, 306; *Leoni* v. *Taylor*, 20 Mich., 155; *Tynan* v. *Walker*, 35 Cal., 639, 643.

But the prosecution advocates this restrictive construction, and the charge of the court to the jury apparently adopted the same view.

While we controvert the construction contended for by the prosecution, and insist that the section applies to all males who cohabit with a plurality of women, we contend that the indictment is not framed on that reading of the statute, which the court below seemed to adopt. It is fatally defective if that construction is the correct one. It does not state a case within section three if it refers only to matrimonial cohabitation.

It must contain allegations of fact, filling every particular, in the description of the offense as defined by construction of the statute: *Bates* v. *State*, 31 Ind., 72; *Schmidt* v.

*State,* 78 id., 41; *Commonwealth* v. *Slack,* 19 Pick., 304; *Commonwealth* v. *Bean,* 11 Cush., 414; *Commonwealth* v. *Stout,* 7 B. Mon., 249; *The Mary Ann,* 8 Wheat., 389.

This indictment should have alleged that the defendant, cohabited with the women *as wives.*

*Messrs. Bennett, Harkness & Kirkpatrick,* also, for appellant.

*Mr. W. H. Dickson,* for respondent.

BOREMAN, J.:

On the seventh day of February, 1885, the defendant, Angus M. Cannon, was indicted in the third district court for the crime of unlawful cohabitation. After trial and a verdict of guilty, he made his motion for a new trial, which was overruled, and thereupon, on the seventh day of May, 1885, he was sentenced to the penitentiary for six months and to pay a fine of three hundred dollars. From the order overruling the motion for a new trial, and from the final judgment the defendant has appealed to this court. The body of the indictment reads as follows:

"The grand jurors of the United States of America within and for the district aforesaid, in the territory aforesaid, being duly empaneled and sworn, on their oaths do find and present that Angus M. Cannon, late of said district, in the territory aforesaid, heretofore, to-wit, on the first day of June, in the year of our Lord one thousand eight hundred and eighty-two, and on divers other days and continuously between the said first day of June A. D. 1882, and the first day of February, A. D. 1885, at the county of Salt Lake and territory of Utah, did unlawfully cohabit with more than one woman, to-wit: one Amanda Cannon, and one Clara C. Mason, sometimes known as Clara C. Cannon, against the form of the statute of the said United States in such case made and provided, and against the peace and dignity of the same."

The appellant claims that the indictment is insufficient, and that it was error to admit evidence under it. He relies upon two alleged defects in the indictment.

First. That it fails to allege or show that the defendant is a "*male person*."

The action is based upon the third section of "an act to amend section 5352 of the revised statutes in reference to bigamy, and for other purposes," approved March 22, 1882, and commonly known as the "Edmunds act." The section referred to provides that "if any male person in a territory . . . shall hereafter cohabit with more than one woman, he shall be deemed guilty of a misdemeanor," etc.

The name Angus is in this community recognized as that of a "male person," the defendant himself, however, being the most public character bearing the name. Outside of this community it is well recognized as a male appellative.

The word *person* embraces all mankind, and mankind is divided into two classes, one male and the other female. The statute says that this crime can be committed only by the members of one class—the male—upon and with members of the other class—the female. When, therefore, as in the case under consideration, the specific crime is charged to have been committed by some person upon and with those of the female class, the natural and inevitable conclusion would seem to be that the "some person," committing the offense belonged to the other, the male class. The law would presume this, and its statement in the indictment would be unnecessary: Crim. Prac. Act, sec. 159, Laws of Utah, 1878, page 94.

The grand jury could not have intended to indict a female under such a statute. To have done so would have been not only irregular, but in violation of their oath. The court cannot in the absence of evidence, assume that the grand jury committed so great a folly and performed so vain a work. All presumptions are in favor of the regularity of their proceedings: *People* v. *Mills*, 17 Cal. 276; 1 Whart. Cr. Law, sec. 713; 2 Russ. on Crimes, page 732.

This is not the case of an indictment where there are different classes or kinds of persons who can commit the offense. That was the peculiar feature of the case of the *People* v. *Allen*, 5 Denio 79, cited by the defense. In such

a case it would be clearly necessary to specify in the indictment the class the defendant was charged with belonging to, for the reason that there were two classes. In the case before us, however, there could be no doubt as to the class, as there is but one class. But in the case of the *People* v. *Allen*, the title, clerk or servant, was not so much a description of the person as it was an element in the description of the offense itself. It was a case of embezzlement, where the money had to be received by him as the clerk or servant, and in the course of his employment as such. In the case at bar, however, the word "male" can hardly be said to be an element in the description of the offense; it is simply a designation of the class of the offender. This designation of the defendant could in no way aid in establishing his identity. That was fixed by the name, which upon arraignment he admitted to be correct.

In some of the states, such as New York, Massachusetts, Pennsylvania, etc., the statutes against rape say, that: "Whosoever ravishes and carnally knows a female," etc.: Mass. Stat., 1871, chap. 55; or: "Every person who shall have carnal knowledge of any woman," etc., 2 N. Y. Rev. Stat., 663, sec. 23, is guilty of rape. The words "male person" do not appear in the statute, yet it is a well known fact that no one but a "male person" could be indicted for such an offense. In a prosecution under such a statute, the court is required to presume, from the very nature of the offense itself, not only that the defendant named therein is a "male person," but it would of necessity have to go one remove farther, and presume the words to be in the statute, that is, that the statute, although it did not say so, meant to apply to "male persons" alone. How much stronger is the case before us where the statute is express and the court has to presume only as to the indictment. We think it is a settled general doctrine that in rape cases, even under the strict rules of the common law, it is not necessary to aver, in the indictment, the sex of the defendant: 2 Whart. Cr. L., sec. 1154; 2 Bishop's Cr. Proc., sec. 901, ed. of 1866; *People* v. *Colton*, 2 Utah 457.

In the cases like the one under consideration, it is gen-

erally unnecessary to aver the sex in the indictment: Bishop St. Crimes, secs. 700, 705-6-7.

A case there referred to was where the indictment charged "that Daniel McLeod and Delany Waters, *alias* Lany Waters, did live together in a state of adultery and fornication." The name Daniel is a well known male appellation, but "Delany" or "Lany" would seem to be as well suited to male as to female persons. Yet, in that case, the court held that it was not necessary in the indictment to state the sex: *McLeod* v. *The State*, 35 Ala. 395.

The same rule that would apply to rape, adultery, and lascivious cohabitation cases, would apply to other classes of cases, in regard to other words. For example, the statutes against murder say that murder is the unlawful killing of a *human being* with malice aforethought. Yet in an indictment for murder it is not deemed necessary to allege that the victim was a *human being*: 27 Cal. 507. In every such case it is conclusively presumed that the deceased was a human being, as there is no such crime as the murder of an animal or an inanimate thing. And further, the statute does not say in express words, that the unlawful killing must be the work of a human being in order to constitute a crime, yet the courts, from the very nature of the offense, do so hold. Not only so, but they go further and presume the defendant who is charged with the crime, to be a human being of a particular class, namely, one of responsible age and of sound mind.

A California statute says, that "any person of the age of fourteen years and upwards who shall have carnal knowledge of any female child under the age of ten years," etc., "shall be guilty of the crime of rape." The supreme court of that state holds that in an indictment under that provision, it is not necessary to aver that the defendant is over fourteen years of age; that the defendant's capacity to commit the crime is an element in the crime: *People* v. *Ah Yck*, 29 Cal. 575, citing *Com.* v. *Scannell*, 11 Cush. 548. So, if in the case before us, it should be considered that the defendant's capacity to commit the crime be an element in it, yet it is not necessary to state, in the indictment, that

he is a "male person." But, as stated above, we do not consider the words "male person" any element in the description of the crime. It would show that he belonged to the class which alone was capable, but it would not show that he individually was capable, or that he was not of irresponsible age, or not of unsound mind.

The cases of *Ex Parte Hedley*, 31 Cal. 108, and *The Com.* v. *Libbey*, 11 Met. 64, referred to by the defense on this point, do not seem applicable. They were both cases of embezzlement, and no question was raised as to the sufficiency of the indictment in either case.

We do not see wherein the insertion of the words "male person" would have aided the defendant in his defense. He could not thereby have been enabled to make any other or different defense than he has made. It would not have enabled him to understand any better the nature of the crime charged. If he has not been prejudiced in respect to his substantial rights he cannot complain: Crim. Proc. act, sec. 479; laws 1878, 165; amended laws, 1884, 126.

We conclude, therefore, that it was not necessary to designate the defendant, in the indictment, by the words, "male person." The fact, however, that he is a "male person" does appear from the indictment, taking it altogether, including the context, the nature of the offense, and the recognized application of the name to male persons.

Second. It is claimed that the indictment is defective in not alleging that the defendant put forth any pretense of marital relation to the woman mentioned. The appellant holds that the court has no right to interpolate words into the statute which the law-making power never intended to be there. That proposition, as a general rule, is undoubtedly true. But, in the case in hand, there is no interpolation. The question is on the indictment, and it shows no interpolation, but, if it exists, it is in the interpretation of the words used in the statute and in the indictment. It is insisted that if the court construes the third section above specified as being confined to matrimonial cohabitation, it is wrong; but that if it is right, then the indictment is defective in not alleging that de-

fendant cohabited with these women *as wives.* So far as the objection to the indictment goes, it is not a question as to whether it is defective if some peculiar construction be adopted, but whether it is defective in law, without any conditions. If it be assumed that the words, "as wives," according to the suggestion in one of the briefs of appellant, were added in the indictment, would the alleged defect be cured? Exactly the same objection would arise as now arises, without the addition of those words. The question would still remain, what is the meaning of the words, "to live or dwell together as husband and wife?" The trouble, therefore, would not be ended if the suggestion of appellant were complied with. The addition of such words to those already in the indictment, would be mere tautology, and would give the appellant no information as to the character of the charge against him that is not found in the indictment as it now stands. From the position taken afterwards in the briefs of the appellant, although the point is not made against the indictment, it is apparent that appellant holds that still other additions should be made to the description of the offense in the indictment. But as such particularity would not be required even in a murder case, we do not think it would be required in a case of misdemeanor. It is never necessary to detail in an indictment all the facts which the prosecution expect to prove, in order to make out a case, nor is the defendant ever entitled to them. He is entitled to a plain and concise statement or description of the offense charged against him, in order to be enabled to make his proper defense, and to enable him to plead a conviction thereunder in bar of another prosecution for the same offense.

In the construction of penal statutes, care must be taken not to put such a construction upon the language as would include the innocent as well as the guilty. The evil to be guarded against must be kept in view: *Com.* v. *Stout,* 7 B. Mon. 249.

We will not likely go astray, if, with this rule always before us, we keep in remembrance that other indispensable rule—namely, that the intention of the legislature

must be sought and followed, except that the construction must not be repugnant to the clear meaning of the words used.

With these rules to guide, the cases cited by appellant under this second heading are clearly not inconsistent with our views of the proper construction to be put upon the statute under consideration. The only object of those references is to show that the indictment should have added the words "as wives" to the word "cohabit," and this we have shown would have availed nothing.

The offense with which the defendant is charged is purely statutory, and it is a new offense in our statutes. It is a general rule, well settled, that in an indictment for an offense created by statute, it is sufficient to describe the offense in the language of the statute: *People* v. *Colton*, 2 Utah; *People* v. *Cronin*, 34 Cal. 191; *Lodano* v. *State*, 25 Ala. 64; *People* v. *Murray*, 6 West Coast Rep. 643, California Case.

The supreme court of the United States say that where a person is indicted for a purely statutory offense, it is sufficient in the indictment to charge the defendant with acts coming within the statutory description in the substantial words of the statute without further expansion: *U. S.* v. *Simmons*, 96 U. S. 360.

Where a new offense has been created by statute, without reference to anything else, it will be sufficient to describe the offense in the terms of the act: *People* v. *Saviers*, 14 Cal. 29; *People* v. *Shaber*, 32 Cal. 38.

To the general rule of describing statutory offenses in the language of the statute there are exceptions, the principal ones being (1) when the statute makes that an offense which was an offense at the common law, and (2) when the offense is described in the statute in terms too general. The cases cited by the appellant come within the one or the other of these exceptions. As we have shown above, the indictment in the present case would have been no more certain and plain than it is even if the definition of the word "cohabit" had been embraced therein. The word has an established meaning, and the indictment gives such particulars of time, place and names

of the women, as to inform defendant wherein he was charged with having violated the law. If the case falls within either of the exceptions to the general rule, and would require more particularity, it has not been shown. It was the duty of the appellant to have done this: *State* v. *Abbott*, 31 N. H. 434; 1 Whart. Crim. Law, sec. 364.

The alleged offense is not claimed to have been an offense at common law, therefore it does not fall within the first of these exceptions, and it does not fall within the second exception unless the description is language too general to give the defendant information to which he is entitled, to enable him to prepare his defense, or to plead the judgment hereafter in bar of another prosecution for the same offense, or too general to guide the court in passing sentence. If the indictment had charged the defendant with "cohabiting with more than one woman," without giving the names of the women, or without time and place, it would have been insufficient in not giving particulars, so as to enable defendant to make proper defense, or to plead the judgment hereafter.

In the exposition of a statute, the intention of the legislature is to be sought and followed, unless, by doing so, the construction to be given is repugnant to the clear meaning of the words, and, if the meaning of the words is plain and obvious, the only safe course is to suppose the legislature intended those things which the words denote: *Taylor* v. *Leoni*, 20 Mich. 155. If the language is clear, it is conclusive, and the words must not be narrowed down to the exclusion of what the legislature intended to embrace, but the intention must be gathered from the words. That sense of the words should be adopted which best harmonizes with the context, and promotes in the fullest manner the policy and objects of the legislature: *U. S.* v. *Hartwell*, 6 Wall. 385

What then was the object of the Congress in enacting this statute? It was, judging from the whole act, intended to be an aid in breaking up polygamy and the pretense thereof. The well recognized difficulty of reaching the polygamy cases, by reason of having to prove marriage, and by reason of the fact that the statute of limitations

bars prosecutions after three years, no doubt led Congress to pass this act. It was sought to break up the polygamic relation. It was necessary in effect to make polygamy a continuous offense, without requiring proof of marriage. Whether marriage took place or not, the pretense of marriage—the living, to all intents and purposes, so far as the public could see, as husband and wife—a holding out of that relationship to the world were the evils sought to be eradicated. Although aimed primarily at such a relationship, it reaches out and embraces all men, living and dwelling with more than one woman as if they were married, whether any marriage had ever taken place or not. It was living and dwelling together under the appearance of being married. The appellant insists that cohabitation necessarily includes sexual intercourse, and that there can be no cohabitation without it. We find nothing whatever in the language or context to lead us to believe that Congress meant to apply the statute to lewd and lascivious cohabitation, which would be the case if the construction contended for by the appellant were correct.

The primary meaning of "cohabit," is to dwell with, *con*, with, and *habere*, to dwell, and at the present day it is generally held to mean to dwell or live together as husband and wife, or to dwell or live together in the same company, place or country: *Calef* v. *Calef*, 54 Me. 365; *Com.* v. *Calef*, 10 Mass. 159; *Ohio* v. *Connoway*, Tappan Ohio, page 90.

This meaning is recognized in appellant's brief, page 4, where it says that "in looking to the common signification of the word 'cohabit,' we find but two meanings, one broad and generic, and including all residents of the same ward, town, city, or even country, and the other the living together as husband and wife." The brief proceeds to place the construction upon the latter words, which we have here referred to, and which we do not think are warranted.

That learned author, Mr. Bishop, says that he knows of no legal authority or usage that would embrace sexual intercourse in the word cohabitation, except the casual misapprehension of Chancellor Walworth in *Dunn* v. *Dunn*, 4

Paige, 425, 428; 1 Bishop's M. & D., section 777, note 1, 4th ed.

The authorities of the appellant on this point do not shake the position that cohabitation does not include sexual intercourse. The word does not even include necessarily the occupying the same bed: 2 Paige Ch. R. 425.

In *Foster* v. *Foster*, 1 Hag. 144, where matrimonial intercourse was sought to be enforced between man and wife, the court drew the distinction plainly between *"matrimonial intercourse"* and *"matrimonial cohabitation,"* holding that "the duty of matrimonial intercourse" could not be compelled, but that "matrimonial cohabitation" could be.

The case of *Orme* v. *Orme*, 2 Eng. Ec. 354, was brought by the wife against her husband for restitution of conjugal rights. The libel admitted that the complainant was "allowed by the said Robert Orme to reside in the same house with him," and the court held that this admission of "cohabitation" admitted the complainant out of court, and that she might have been restored to cohabitation, yet, as that was admitted to exist, and the court could go no farther, that the court had no power to restore the complainant to matrimonial intercourse with her husband.

Had it been the intention of congress to include the common sexual vices in this provision, it appears unreasonable that it should not have said so. It evidently did not intend to include lewd or lascivious cohabitation; for, had it so intended, it would have added those words. When the bill was under consideration in Congress, their attention was specially called to the matter, and it could not, therefore, have been an oversight. A member (Mr. Singleton) offered an amendment, whereby it was proposed to reach all of the sexual vices, and to punish adultery, fornication, open and notorious lewdness, etc.; but the amendment was voted down: Congressional Record, March 15, 1882.

Thus Congress clearly gave expression to their view, that no such offenses were to be embraced in the act. The crimes which Congress proposed to punish were such as a large part of the people, especially in this territory, were upholding and practicing. The other vices were such as

all people disapprove, and hence Congress left their suppression to the local authorities. The interpretation we have given to this provision—the third section—is, as we think, the one best calculated to effect the object intended by Congress and to suppress the evil.

Hence, independent of the statutes of this territory governing pleadings in criminal cases, we think the indictment is sufficient; that it was not necessary to have added the words "as wives" to the description of the offense as set out in the indictment, nor to have given any particulars of the facts necessary to be proved, beyond what were given, and especially that it was not necessary to allege anything in regard to sexual intercourse.

We have, however, a criminal procedure act in this territory which governs the mode and manner of criminal pleading; and we now come to consider that act, and see what effect it has upon the matters necessary to be stated in the indictment.

The criminal procedure act of this territory is to the criminal practice what the civil procedure act is to the civil practice: 27 Cal. 507.

As we are bound by the criminal procedure act, it is unnecessary to inquire what was the rule at common law when the statute speaks: *People* v. *West*, 49 Cal. 610; *People* v. *Murphy*, 39 Cal. 52; *People* v. *Cronin*, 34 Cal. 191.

The criminal procedure act says: "All forms of pleading in criminal actions and the rules by which the sufficiency of pleadings is to be determined, are those prescribed by this act:" Utah Laws, 1878, p. 91.

If the indictment will stand the test of these rules, it will be sufficient, no matter how much it might fall short of what would have been necessary at common law: *People* v. *King*, 27 Cal. 510; *People* v. *Dick*, 37 Cal. 277; *People* v. *Cronin*, 34 Cal. 191; *People* v. *Murphy*, 39 Cal. 52.

In section 150 of the criminal procedure act it is provided what the indictment must contain. After specifying that it must give the names of court and parties, it says the indictment must contain "a clear and concise statement of the acts or omissions constituting the offense, with such

particularities of the time, place, person and property as will enable the defendant to understand distinctly the character of the offense complained of and answer the indictment." A form of indictment is given. Section 151 provides that the indictment must be direct and certain as it regards, (1) the party charged; (2) the offense charged; and (3) the particular circumstances of the offense.

Section 158 specifies that the indictment will be held good if it can be understood from it (amongst other things not here brought in question), so far as the description of the offense goes, "that the act or omission charged as the offense is clearly and distinctly set forth, without repetition, and in such manner as to enable the court to understand what is intended, and to pronounce judgment upon a conviction, according to the right of the case."

To have enabled the defendant to answer the indictment it could not have been necessary that he should have been apprised of the fact by express averment that he was a *male person;* nor could it have been necessary, as we have seen, to make him to understand the character of the offense charged and to answer it, that the offense should have been otherwise or more particularly described than has been done. The offense is clearly and distinctly set forth—there is no repetition—and it is set out in manner sufficient to enable the defendant and the court to understand it, and to guide the court in pronouncing judgment.

If appellant thought the indictment defective in either respect, he should have demurred: Crim. Proc. act, sec. 192; laws of Utah, 1878, 101. The defects were such as could have been reached by demurrer. As appellant did not demur, he waived his objections: Sec. 200 of Crim. Proc. Act; *People* v. *Swensen*, 49 Cal. 388. By said section 200 it is provided that all objections mentioned in section 192, authorizing demurrer, if they appear on the face of the indictment, can only be taken advantage of by demurrer, except that the objection to the jurisdiction of the court over the subject matter of the indictment and the objection that the facts stated do not constitute a public offense, can be taken at the trial, under the plea of not guilty, or after trial in arrest of judgment. The

objections urged are such as appear on the face of the indictment, and neither objection goes to the jurisdiction of the court. If, then, the indictment alleges facts sufficient to constitute a public offense, it is sufficient, and there is no remaining objection to the indictment that the appellant can raise after having failed to demur. We have already seen that a public offense was clearly and concisely alleged.

The appellant, however, raised the objections at the trial, claiming that the indictment was too defective to allow of the admission of any testimony under it. Yet from what we have said, it plainly appears that there were no grounds for the objections, and that if there were they had been waived.

We are brought now to the consideration of the alleged errors in excluding testimony offered by the defense. Several questions by the defense were asked a witness for the prosecution, which were objected to by the prosecution as irrelevant, immaterial and incompetent. The avowed object of these questions, as stated by the defense, was to show or tend to show non-access during the time charged, and as tending to disprove any presumption of sexual intercourse which might be raised by the testimony of the witness. The objections were sustained. The defense made an offer of proofs, the gist of which was to the same effect. Part of the offer was wholly hearsay—where he sought to show what was told the women—a large part was wholly made up of admissions, and the residue bore upon the question of sexual intercourse and occupying the same bed. We have already seen in this opinion that sexual intercourse was not a necessary element in the crime. If it were an element—a necessary element—as the defense claim, then the prosecution might have shown that the defendant and these women lived together, in the same house and company, that they were continually walking, talking, acting as husband and wife, treating each other so before their neighbors and the public generally, calling each other husband and wife respectively, having all their dealings before the world as husband and wife—he might be providing for all her wants of clothing, food, house

and household affairs, and claim the women as his wives, and doing many more like things, and yet if the prosecution did not prove that defendant had sexual intercourse with these women, the prosecution would have to fail. The prosecution would have to prove adultery when adultery was not charged, would have to prove fornication and lewd and lascivious cohabitation when none of these charges had been made, and all such offenses had been purposely left out of the act by the law-making power. It seems to us preposterous that Congress could ever have intended such a thing when the law was enacted. Congress never could have intended to include those things which it purposely excluded. If the sexual intercourse and bedding together were not parts of the offense necessarily, what advantage could it be to a defendant to disprove the existence of such things, especially when it would be the duty of the court—and it was done in this case—to instruct the jury that sexual intercourse and bedding together were not necessary parts of the offense. What is the advantage of introducing in evidence facts which immediately thereafter the court will have to rule out or declare of no importance, We do not think that the defendant could in any way be harmed by the rejection of such evidence. Its admission would not disprove nor tend to disprove any testimony by the prosecution. It would only tend to disprove that which the court correctly instructed the jury was not important.

The appellant urges as error the refusal of the court to give instructions asked by him. There were twenty-four such instructions, between many of which there was but a shade of difference. The first and second of these instructions affirmed the existence of the Edmunds Act and its applicability to this territory. They were wholly immaterial and irrelevant. Their rejection could in no way have affected the result. The jury take the law from the court, and it is not their province to know or to be informed where the court obtained the law.

The third rejected instruction, having reference to the non-applicability of the act to persons cohabiting with lawful wives, has no application to the evidence in the case.

The fourth, fifth, sixth, seventh, eighth, ninth, eleventh, eighteenth and twenty-first have direct reference to sexual intercourse and are wholly outside of the case and not applicable.

The thirteenth is misleading; it has reference to fathers not being compelled to break off all communication with the mothers and the children. It would indirectly lead the jury to believe that the acts of the defendant in regard to the women were perfectly justifiable.

Nos. 14, 15, 16 and 17, have reference to the evidence of the relationship existing between the defendant and the women, at and prior to the passage of the Edmunds Act, and indirectly raise the question as to the competency of such evidence.

In California a man was being tried for the alleged murder of his wife. A witness upon being questioned, said that about *a month before* the homicide the deceased wife came to her house greatly excited, and when she came the defendant in the case had been heard swearing and breaking doors, windows and other things in his own house, and that this was going on for some time. The defense objected to the testimony, but it was admitted, the court holding the admission proper, and that these circumstances, although occurring some time before the homicide, taken in connection with the circumstances of the homicide, were proper for the consideration of the jury; that these facts tended to show the feeling of the defendant toward his wife and his treatment of her, although this was before the homicide, and in some degree they tended to show a motive for taking the life of the wife: *People* v. *Kern*, 61 Cal., 244.

The case of *Badger* v. *Badger*, referred to by the defense upon another point, recognizes the doctrine that a meretricious intercourse in the beginning is presumed to continue unless there be evidence of a change; 88 N. Y., 546; *Theyer* v. *Theyer*, 101 Mass., 111. The principle of these cases applies to the case under consideration.

The evidence of what occurred prior to the date alleged in the indictment and prior to the passage of the law, was proper for the consideration of the jury, and the jury were,

notwithstanding, instructed that they must presume the
defendant to be innocent until the contrary be shown.   It
is not proper nor necessary, although it is sometimes done
when no objection is offered, to tell the jury specially that
they were at a particular time and before the time alleged
in the indictment to presume him innocent, but the charge
of the court covers all time down to the closing of the
case by verdict.   Such charge of court could not have mis-
led the jury, for they find the defendant guilty as charged,
and he is charged with an offense between certain dates.
The rejected instructions could have done the defendant
no good, their rejection certainly did him no harm.   It is
no doubt error to refuse to give an instruction asked and
which is material, and has not been given in or covered by
the charge; but it is not error to refuse immaterial requests:
*People* v. *King*, 27 Cal., 507; *People* v. *Kelly*, 28 Cal., 423;
*People* v. *Strong*, 30 Cal,, 151; *People* v. *Lachanais*, 32
Cal., 433; *People* v. *Ah Kong*, 49 Cal., 6.

The tenth instruction asked by defense and refused has
reference to what rule the court should adopt in the inter-
pretation of the statute.   It might properly be addressed
to the court, but it was a matter with which the jury had
nothing to do.

The twelfth instruction refused had reference to the
legitimizing of polygamous children.   It was wholly ir-
relevant and immaterial.

The twenty-second, twenty-third and twenty-fourth in-
structions refused have reference to the necessity of show-
ing marriage or marriage ceremony.   No ceremony of
marriage is necessary to be shown in this class of cases.
The instructions were therefore irrelevant and immaterial.

The twentieth refused instruction—relating to the hold-
ing out of Clara C. Cannon as wife—is covered by the
charge given.   In some of the instructions refused, there
may have been isolated sentences that were proper, but we
think that in every such instance, it is covered by the
charge.

The next error assigned is the giving of the instructions
by the court, as embraced in the charge.

The court gave the time within which the offense was

charged · to have been committed, and stated what the charge was, and then detailed, in general terms, classes of circumstances which would, if proven, make out such a case as would authorize the jury to find defendant guilty. The court charged upon the question—the most vital 'in the whole case—the question of sexual intercouse and correctly so charged, and the court reminded the jury of the presumed innocence of the defendant, and that they were the judges of the credibility of the witnesses, etc. We cannot see wherein the court has failed to cover the whole case in the charge. If there be any errors at all, they are unimportant, and for such errors courts will not reverse: *People* v. *Varnum*, 53 Cal., 630.

The charge must be taken as a whole, and if it fairly and correctly presents the law bearing upon the issues, the appellate court will not disturb the judgment: *People* v. *Hortad* 63 Cal., 288; *People* v. *Welch*, 49 Cal., 174.

It is on the defendant's motion for new trial urged that the verdict should have been set aside because one Johnson, a juror, was a bigamist. The affidavits, as to the incompetency, are not embraced in the bill of exceptions, and hence are not properly before us: *People* v. *Stonecifer*, 6 Cal., 405. But if they were, the verdict could not be set aside: *People* v. *Lewis*, 5 West Coast Rep., 259; sec. 188, Laws of Utah, 1878.

For the reasons stated throughout this opinion, it is apparent that the overruling of the motion for a new trial was proper, and the judgment was correct.

The order and judgment of the court below are affirmed.

ZANE, C. J., concurred.

POWERS, J. concurring.

Although I agree with the majority of the court in the construction of the word "cohabit," as used in the "Edmunds Act," so-called, and also in the result reached, I am unable to concur in the conclusion that there is no error in the record and I have, therefore, deemed it proper to express my views as to the whole case.

The indictment charged that the defendant "Angus M. Cannon, late of said district, the third, in the territory aforesaid, to-wit: on the first day of June, in the year of our Lord, one thousand eight hundred and eighty-two, and on divers other days, and continuously between the first day of June, A. D. 1882, and the first day of February, A. D. 1885, at the county of Salt Lake and territory of Utah, did unlawfully cohabit with more than one woman, to-wit: one Amanda Cannon, and one Clara C. Mason, sometimes known as Clara C. Cannon, against the form of the statute of the United States in such case made and provided, and against the peace and dignity of the same."

The main controversy arises over the construction of the word "cohabit." The prosecution contend that it means to dwell together as husband and wife; that it does not necessarily include intercourse between the sexes, and that the law clearly distinguishes "matrimonial cohabitation" from "matrimonial intercourse."

Upon the part of the defendant, it is contended that all cohabitation which the law deals with is sexual cohabitation; that the word, as used, means a dwelling together by male and female adult persons, in the intimacy of husband and wife, and that sexual intercourse is necessarily implied.

Eminent counsel have argued the case with marked ability, and its importance, not only to the defendant, but also to the people, demands that it should receive the most careful consideration of this court.

I. In order to correctly understand what is meant by the statute when it says, "if any male person in a territory . . . hereafter *cohabits* with more than one woman, he shall be deemed guilty of a misdemeanor," let us endeavor to ascertain what was the object that Congress had in view in the passage of the act, which was the evil it sought to remedy, and what was the mischief it aimed to suppress.

If we consider the evident purpose of the "Edmunds Act," and view it in the light of the exigency which caused its enactment, the conclusion seems inevitable that its purpose and intent is to protect monogamic marriage.

It does not appear that its aim is to punish mere sexual crimes. This seems to have been the view taken by Congress: See Congressional Record, March 15, 1882, p. 34; but, however that may be, it seems to be the view that is supported by reason and authority.

Marriage, as understood in Christendom, means the "voluntary union of one man and one woman, to the exclusion of others." The term, therefore, is not correctly applied to the union of one man with more than one woman: Story on Conflict of Laws, 8 ed., 184, note. It is the parent and not the child of society, for it is the very basis of the whole fabric of civilized society: Story on Conflict of Laws, 185. It is something more than a mere contract. It is rather to be deemed an institution of society, founded upon the consent and contract of the parties; and in this view it has some peculiarities in its nature, character, operation and extent of obligation, different from what belongs to ordinary contracts: Story, 185. No legislation can be supposed more wholesome and necessary, in the founding of a free, self-governing commonwealth, fit to take rank as one of the co-ordinate states of the union, than that which seeks to establish it upon the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political improvement: *Murphy* v. *Ramsay*, 114 U. S. 45. Marriage is the foundation of the home, and upon it is builded the entire superstructure of society. It finds its defense in every human heart, which jealously guards the one object of its affection. It is the outgrowth of progress and enlightenment, for it recognizes that the wife and mother is the equal of the husband and father.

There is far more to the marriage relation than the mere gratification of passion, or the procreation of children. The wife, taking her place by her husband's side, his equal, his counselor, his friend, makes of him a perfect man. Together they share the sorrows of life; together

they enjoy its blessings.   When each is true to the other, they present a union not made by man, and, as they pass along life's pathway, their very example is of infinite benefit to mankind.   Anything which tends to bring this relation into disrepute is an injury to the world.   Anything which lowers the popular appreciation of the relation and destroys the good that marriage does the world by mere example, is an evil which the law should correct.

Society, with all its ramifications, being founded upon marriage, it is upon grounds of public policy that it is regulated and protected.   When the act in question was passed, Congress was aware that in some of the territories there are people who believe that it is right for a man to take and live with more than one wife; that there are men who not only marry more than one woman, but who say to the world, by conduct and by words, that two or more women with whom they are living are their wives. The law-making power saw that the mere fact of a plural marriage is an evil example; that the living and associating with two or more women as if married to all tends to weaken the popular appreciation of true marriage, and this is detrimental to society.   Therefore, for the purpose of protecting the marriage relation, the law under discussion was passed.   It is directly aimed at the suppression of polygamy and the polygamous household as an evil example, dangerous in its tendency to the family relation as recognized by this nation.   It was not the offense against chastity merely, but the offense against the family, which Congress intended to suppress.   To accomplish its object, the law has several provisions.   It provides for the punishment of offenders by the courts, and by restricting their political privileges.   It will be necessary to refer to two or three of its sections.

"SEC. 1.   Every person who has a husband or wife living who, in a territory or other place over which the United States have exclusive jurisdiction, hereafter marries another, whether married or single, and any man who hereafter simultaneously, or on the same day, marries more than one woman, in a territory or other place over which the United States have exclusive jurisdiction, is guilty of

polygamy, and shall be punished by a fine of not more than five hundred dollars and by imprisonment for a term of not more than five years; but this section shall not extend to any person by reason of any former marriage, whose husband or wife by such marriage shall have been absent for five successive years, and is not known to such person to be living, and is believed by such person to be dead, nor to any person by reason of any former marriage which shall have been dissolved by a valid decree of a competent court, on the ground of nullity of the marriage contract."

Under this section, "the crime of bigamy or polygamy consists in entering into a bigamous or polygamous marriage. Continuing to live in that state afterwards is not an offense, although," as we shall see later on, "cohabitation with more than one woman is:" *Murphy* v. *Ramsay*, 114 U. S. 42, 43. As will be seen from the construction placed upon this section by the supreme court of the United States, and quoted above, it is the fact of marriage with two or more persons that constitutes the offense. It is plain that the first section of the act deals simply with the marriage relation. This section does not punish offenders for cohabitation or sexual intercourse, but for entering into a bigamous or polygamous marriage: Ibid. Proof of the marriage is all that is essential.

The third section of the act reads as follows:

"SEC. 3. That if any male person, in a territory or other place over which the United States have exclusive jurisdiction, hereafter cohabits with more than one woman, he shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than three hundred dollars, or by imprisonment for not more than six months, or by both said punishments, in the discretion of the court."

When these two sections are read together they seem plain. One makes the fact of marriage an offense, without reference to cohabitation or sexual intercourse. The other makes unlawful the cohabitation, or appearance of marriage. Previous to the act becoming a law, many had contracted bigamous or polygamous marriages and were living with their wives. The object of the third section

obviously is to put an end to polygamous establishments. It was designed to meet cases which the first section could not. Many prosecutions for polygamy might be barred by the lapse of three years, by Section 1,044 of the Revised Statutes of the United States, and yet a man might be living with more than one woman as a husband lives with his wife, and by his example be doing the public positive injury. The fact whether he does or does not have sexual intercourse with the women with whom he is associating as a husband associates with his wife, is a matter of but little moment when compared with the greater wrong done to society.

Another section of the statute I quote:

"SEC. 7. That the issue of bigamous or polygamous marriages, known as Mormon marriages, in cases in which such marriages have been solemnized according to the ceremonies of the Mormon sect, in any territory of the United States, and such issue shall have been born before the first day of January, A. D. 1883, are hereby legitimated."

Thus, by these provisions, Congress says, in substance, there must be no more plural marriages. The children born or begotten at the time of the passage of the act, are legitimate, but hereafter they are illegitimate; and no male person can live with more than one woman as his wife. It would seem that the word "cohabit" implies or means no more than the outward appearance of a living with two or more women as a husband lives with his wife.

If this is so, then the prosecution, in order to make out a case, are not required to satisfy the jury that the parties indulge in sexual intercourse. Neither would it be a defense for a man accused of unlawful cohabitation to prove that he did not indulge in sexual intercourse with the women whom he held out to the world as his wives, or, in other words, with whom he cohabits.

II. The defendant claims that there are two defects in in the indictment.

1. That it fails to show that the defendant is a "male person."

2. The indictment does not allege that the defendant

put forth any pretense of marital relation to the women therein mentioned.

I agree with my brethren, that the indictment is sufficient. The sex is sufficiently shown, if that is necessary, by the name Angus. I think it would not mislead the defendant, and it is not claimed that he is not the man named. The precise words of a statute need not be followed in order to make an indictment valid.

The indictment follows the language of the act in describing the offense. This seems to be sufficient, particularly in statutory misdemeanors, and it may be laid down as a general rule to which there are few exception: *State* v. *Rust,* 35 N. H. 438; *U. S.* v. *Mills,* 7 Pet. 138, 432; *U. S.* v. *Gooding,* 12 Wheat. 460, 281; 1 Wharton Cr. Law, section 364; *Romp* v. *State,* 3 Greene, Iowa, 276; *Chambers* v. *People,* 4 Scam. 451; *State* v. *Kegan,* 22 Mo. 459; *State* v. *Mitchell,* 6 Mo. 147; *Simmons* v. *State,* 12 Mo. 268; *Whiting* v. *State,* 14 Conn. 487; *People* v. *Colton,* 1 Utah 457; *People* v. *Thompson,* 4 Cal. 238; *People* v. *Savier,* 14 Cal. 29; *People* v. *Martin,* 32 Cal. 91; *People* v. *Cronin,* 34 Cal. 191, 208. Besides, the defendant failed to demur specially, and, if there was any defect, it was waived: Crim. Prac. Act, section 200. But there does not appear to be any defect, as the indictment clearly meets the requirements of the Criminal Practice Act: See Cr. Prac. Act, section 158.

III. On the trial, Clara C. Cannon was sworn as a witness for the prosecution, She testified as follows: "I know the defendant. I have been his wife. I was married to him about ten years ago, and have since lived at 246 First South street, Salt Lake City. I live there now, and have lived in the same house since shortly after I was married. The defendant has lived in the same house part of the time, and in the same house during the past three years. I have one living child, which was the child of that marriage, born January 11, 1882. I have had two other children by that marriage, both born before the living one. In this house I occupied two rooms on the ground floor— a parlor, and a dining room, on the east side. My kitchen is back, not attached to my part of the house. I have oc-

cupied this part of the ground floor since I first went to
live in the house. There is a hall running through the
house on the ground floor, and the rooms I occupy on that
floor are on the east side of the hall. I know Amanda C.
Cannon. She has lived in the same house that I live in
during the past three years. She has occupied, on the
ground floor, two rooms on the west side of the hall, be-
side her kitchen, which is attached to the back of the
main building, and is not the kitchen I use. I suppose
Amanda Cannon is defendant's wife. I have heard him
speak of her as his wife, as Mrs. Cannon, and she has lived
in the same house ever since I went to live there. She
has nine children, I think. During the past three years,
I think, all her children have been living there at home,
but not all the time. My child lives with me, in my part
of the house—I mean the child of this marriage. The
children of Amanda Cannon live with her in her part of
the house. During the past three years, and prior to the
month of February in this year, the defendant has been
in the habit of taking his meals with me, in my part of
the house, a portion of the time, about one-third of the
time. There were stated intervals; he took his meals with
me every third day—with me and my children. I have a
son and a daughter, grown up, and two orphan children.
He took his meals with me and the child of this marriage,
and the other children, every third day. He took his
meals with Amanda Cannon and her family one-third of
the time. He took all three of his meals with me every
third day—on week days, and on Sunday morning he had
breakfast at my house—that is, he took his meals with
me two days of each week, and also his breakfast Sunday
morning, which made one-third of the time. On Sunday
he took his dinner at Sarah's, and his supper at Amanda's.
There are four rooms on the second floor of the house,
used as bedrooms, and a hall, with two of the rooms on
either side of it. The rooms open into the hall. During
the past three years, I have occupied the bedroom in the
northeast corner, and Amanda has occupied the one in the
southwest corner of the house. The defendant has occu-
pied the bedroom in the southeast corner. The room oc-

cupied by me as a bedroom, and the one occupied by defendant as a bedroom, are on the same side of the hall, and there is no intervening room."

On cross-examination, the witness was asked by counsel for defendant several questions, the purpose being, as stated, as "tending to show, with other evidence to be given, non-access during the time charged in the indictment, and as tending to disprove any presumption of sexual intercourse which might be raised by the testimony of the witness."

The prosecution objected to each question, on the ground that it was immaterial, irrelevant and incompetent. The court sustained the objection and defendant excepted.

I think there can be no question but that this testimony was admissible. True, the fact that the defendant did not have intercourse with these women would not be a defense, but in view of the evidence elicited by the prosecution, it became proper. The court in his charge could have instructed the jury as to the weight to be given to this evidence. We must remember that these questions were asked in cross-examination, and that great latitude is allowed. We must bear in mind, also, that the prosecution had shown, on the direct examination, that the defendant occupied a bedroom adjoining that of the witness, there being no intervening room. The evident purpose of the prosecution in eliciting this testimony was to enable the jury to infer that the parties enjoyed sexual intercourse. That is the natural inference that would be drawn from such testimony, and the defense were entitled to rebut it. That the prosecution understood that such an inference would be readily drawn is shown by their brief in the Musser case—a similar case to this, and argued at the same time. In that brief, speaking of the proof showing cohabitation, it is said: "His, Musser's, bedroom is between the bed-chambers of the women, and open doors afford ready and easy access to the marriage beds." It is plain that the testimony is open to the inference that I have drawn from it.

On cross-examination, anything that will explain, modi-

fy, or cut down the testimony drawn out on the direct is proper. "A party always has the right to call out on cross-examination any fact within the knowledge of the witness, which has a tendency to affect or qualify the evidence he has given in chief, whether it points to the same circumstances about which he testified or not. A more restricted rule renders cross-examination in many cases nearly valueless, and enables a party by careful questions to his witness to give to the jury a one-sided and partial view of the facts within the knowledge of the witness, and effectually to preclude the opposite party from supplementing the witness' statement, with the further facts within his knowledge concerning the same transaction, unless he shall make the witness his own, in which case he is supposed to vouch for him as credible, and has also a less privilege of searching examination:" *Det. & M. R. R. Co.* v. *Van Steinberg*, 17 Mich. 100.

IV. With regard to the charge of the court, the error lies not so much in what the judge did say as in his failure to say what he ought. This case belongs to a class that creates great public interest. Men have strong prejudices, and are prone to follow their prejudices, whether they are fully borne out by testimony or not. Therefore, a court, which should always be fair, always be calm, and, no matter what the public may demand, should always mete out impartial and even-handed justice, should carefully throw about a defendant the safeguards to which the law says he is entitled. The charge to the jury was remarkably brief. It was as follows:

"The indictment in this case charges that the defendant, on the first day of June, in the year of our Lord 1882, and on divers other days continuously between said first day of June, 1882, and the first day of February, 1885, did unlawfully cohabit with more than one woman, to-wit: One Amanda Cannon and one Clara C. Mason, sometimes known as Clara C. Cannon. If you believe from the evidence, gentlemen of the jury, beyond a reasonable doubt, that the defendant lived in the same house with Amanda Cannon and Clara C. Cannon, the women named in the indictment, and ate at their respective tables one-

third of his time or thereabouts, and that he held them out to the world by his language or his conduct, or by both, as his wives, you should find him guilty.

"It is not necessary that the evidence should show that the defendant and these women, or either of them, occupied the same bed, or slept in the same room, neither is it necessary that the evidence should show that within the time mentioned, he had sexual intercourse with either of them.

"I will state, the law presumes the defendant innocent until proven guilty, beyond a reasonable doubt; that you are the judges of the credibility of the witnesses, the weight of the evidence and of the fact, and if you find the defendant guilty you will say in your verdict, 'We, the jury, find the defendant guilty, in the manner and form as charged in the indictment;' and if you find him not guilty you will say: 'We, the jury, find the defendant not guilty.'"

The foregoing comprises the entire charge from beginning to end.

The court should have informed the jury that this prosecution was brought under the provisions of the "Edmunds act," and they should have been informed when the act took effect. They should have been told that prior to the passage of that act, cohabitation was not an offense. The word "cohabit" should have been defined, and the jury instructed that unless they found, beyond a reasonable doubt, that the defendant had cohabited with the woman named in the indictment since the "Edmunds act" took effect, and within the time named in the indictment, they should acquit. The defendant requested instructions on all these points and they were refused. This refusal was error, for it is the duty of the judge when requested, to instruct the jury upon every point of law pertinent to the issues: *People* v. *Taylor*, 36 Cal., 255; *Hayes* v. *Paul*, 51 Penn. St., 134. A party has the right to have the jury instructed upon the law of the case clearly and pointedly, so as to leave no reasonable ground for misapprehension or mistake and it is error to refuse to instruct when requested, upon points pertinent to the issue: *Muldouney* v, *Ill. Cent. R. Co.*, 32 Iowa, 176; *Carpenter* v. *State*, 43

Ind., 371; *Morris* v. *Platt,* 32 Conn., 75; *Nels* v. *State,*
2 Tex., 280.

As far as the evidence goes the judge should give any
pertinent instructions asked for conformable to the law:
*State* v. *Wilson,* 2 Scan., 225; *Davis* v. *State.* 10 Ga., 101.

He need not adopt the language of counsel asking the
instruction; but if the form and substance is not objec-
tionable it is better so to do: Bish. Crim. Pro., sec. 981.

Any explanation may be added, or of course any modi-
fication of its terms may be made: *Lambeth* v. *State,* 23
Miss., 322; Bish. Crim. Pro., sec. 981 and cases cited.

It is true that the court charged the jury that "the law
presumes the defendant innocent until proven guilty be-
yond a reasonable doubt," but the defendant was entitled
to have them charged in the language of his fifteenth and
sixteenth instructions, which were as follows:

"15.    The law presumes  innocence, and, therefore, that
all persons who were cohabiting when the Edmunds law
took effect, contrary to the provisions of that act, then
ceased to do so."

"16.    No fact in the conduct of the defendant, subse-
quent to the passage of the Edmunds act, can be made,
more significant of guilt in violating the section against
cohabitation, by reason of the existence of the polygamous
relation between him and the women mentioned in the
indictment, prior to the passage of the statute."    A gen-
eral abstract statement that the law presumes innocence
is not equivalent to specific instruction that the law pre-
sumes innocence in a particular predicament shown by the
evidence.

So, also, the last half of the thirteenth request should
have been given.    That instruction was, "that all the de-
fendant's social familiarity with the mothers of such
families, established prior to the passage of said act, not
shown to include all the particulars of cohabitation, as the
court has defined it, should be considered by the jury with
the legal presumption of innocence, and the failure to es-
tablish such cohabitation would entitle the defendant to
acquittal."

Evidence had been introduced of matters occuring prior

to the passage of the law. The jury should, therefore, have been told that to find the defendant guilty, they must find that he had cohabited with the women named, within the time stated in the indictment. They were told that the defendant was charged with cohabiting with the women, between certain days; but they were not told that they must confine their investigation of his guilt or innocence to the proof of facts and circumstances occurring between those dates. On the contrary, they were at once informed that if they found beyond a reasonable doubt, that the defendant lived in the same house with the women, ate at their tables, and held them out to the world as his wives, they should find him guilty. More restriction should have been placed upon the investigations of the jury, for no act done prior to the passage of the act, can be made by that act, the basis of a criminal charge. Nor can subsequent legislation make a prior act conduce to a conviction, for it would then alter the situation of the defendant to his disadvantage: *Kring* v. *Missouri*, 107 U. S. 221; *U. S.* v. *Hall*, 2 Wash., 366.

I have pointed out the foregoing errors, in order that they may be avoided in future trials of like nature. I think, however, that in the present case they are errors without prejudice, for, after most mature and conscientious reflection, I am not convinced that they affected the result. All of the testimony taken upon the trial is brought up with the record. After carefully considering it in all its bearings, I am persuaded that it clearly shows the defendant to be guilty as charged in the indictment. I am convinced that the verdict of the jury would not have been different than it was, even had the errors not existed. I, therefore, concur in the conclusion of the court affirming the judgment of the court below.