**UNITED STATES of America ex rel. Herman Frederick MARKS, Relator,**

v.

**P. A. ESPERDY, as District Director of the Immigration and Naturalization Service, New York District, United States Department of Justice, Respondent.**

United States District Court
S. D. New York.

March 29, 1962.

See also 198 F.Supp. 40.

Murray A. Gordon, New York City, for relator, Franklyn Gould, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., New York City, for respondent, Roy Babitt, Sp. Asst. U. S. Atty., of counsel.

CASHIN, District Judge.

This is a habeas corpus proceeding brought on the petition of the relator, Herman Marks, challenging the lawfulness of his detention by the respondent under an order of deportation by the Attorney General, and seeking the determination of this court whether, by operation of Section 349(a) (3) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1481(a) (3), he has lost his native-born American citizenship as a result of alleged service in the armed forces of a foreign state.

■ An administrative proceeding was brought to deport the relator as an alien, pursuant to § 241(a) (1) of the Immigration and Nationality Act of 1952,

8 U.S.C.A. § 1251(a) (1). The charges alleged that, although a native-born American, the relator was no longer a citizen of the United States, having become a member of the armed forces of Cuba without the consent of the Secretary of State or Secretary of Defense of the United States.

Section 349 provides, in pertinent part:—

"(a) From and after the effective date of this chapter a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—

"(3) entering, or serving in, the armed forces of a foreign state unless, prior to such entry or service, such entry or service is specifically authorized in writing by the Secretary of State and the Secretary of Defense: *Provided*, That the entry into such service by a person prior to the attainment of his eighteenth birthday shall serve to expatriate such person only if there exists an option to secure a release from such service and such person fails to exercise such option at the attainment of his eighteenth birthday."

It was also charged that the relator was an excludable alien on the grounds that when he reentered the United States he did not possess the requisite documents and, further, had been convicted of a crime involving moral turpitude. After a hearing before a Special Inquiry Officer, he was ordered deported; the order was affirmed on appeal to the Board of Immigration Appeals. It is well-settled law, however, that when, as in the case at bar, there has been a substantial claim of citizenship, the adjudication of the facts of alienage and citizenship, without which deportation cannot lie, must be determined judicially in a *de novo* proceeding. Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938 (1922); Perez v. Brownell, 356 U.S. 44, 47, 78 S. Ct. 568, 2 L.Ed.2d 603 (1958); Dos Reis ex rel. Camara v. Nicolls, 161 F.2d 860 (1 Cir. 1947). Being a citizen of the United States by virtue of his birth with-

in its confines, relator is obviously entitled to such a judicial proceeding.

It has further been stipulated between the parties, with the approval of the court, that the transcript of the testimony in the proceedings before the Special Inquiry Officer shall be deemed the testimony proffered to this court, subject to the objections reserved by counsel.

The relator's petition for a writ of habeas corpus asserts as the basis for the unlawfulness of his detention that he has never lost his United States nationality. He argues that the Attorney General therefore lacks the jurisdictional fact of alienage, without which the relator cannot be deported.

Since he became a citizen of the United States at birth by virtue of Section 1 of the 14th Amendment to the Constitution, Marks urges that the Congressional enactment pursuant to which he is asserted to have lost his citizenship is beyond the power of Congress to enact and is unconstitutional. He also contends that the provision of expatriation is a cruel and unusual punishment violative of the 8th Amendment, and is therefore unconstitutional. He further asserts that if any branch of government possesses the power to denationalize a native-born American citizen, such power may be exercised exclusively by the judicial branch of the Government, and that § 349 (a) (3) of the Immigration and Nationality Act as here applied is an unconstitutional and improper exercise of the judicial power by an administrative agency, and that the procedures employed in the proceeding constituted a denial to the relator of the due process of law guaranteed to him by the 5th Amendment.

The relator's petition next claims that even if the statute were held to be constitutional, he is not an alien since he has not come within the provisions of the expatriating section; and that even if it is found that he has expatriated himself, he cannot be deported because this court should rule that the two grounds upon which deportability is based are both inapplicable. Marks further asserts that even if the court determines him to be a

deportable alien, he is nonetheless entitled to the writ because his continued custody under the Attorney General's order is improper since he is stateless and will not, it is claimed, be deported from the United States to Cuba or any other nation.

■ The relator questions the constitutionality of Section 349(a) (3) of the Immigration and Nationality Act, 8 U.S. C.A. § 1481(a) (3). It is, however, a well-established principle of procedure that when the constitutionality of an act of Congress is challenged, such inquiry and its resolution should be avoided if possible. Ashwander v. T. V. A., 297 U.S. 288, 345–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936). The court will, therefore, first find the facts surrounding the acts, and apply them to the language of the section; then it will determine, if necessary, the constitutionality of the section. Ashwander v. T. V. A., supra.

■ The burden of the Government is a heavy one; the proof to establish loss of citizenship must be clear, unequivocal and convincing. Nishikawa v. Dulles, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958); Gonzales v. Landon, 350 U.S. 920, 76 S.Ct. 210, 100 L.Ed. 806 (1955); Baumgartner v. United States, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944); Schneiderman v. United States, 320 U.S. 118, 158, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943). Since the relator has injected the issue of voluntariness into the case, the Government has the same heavy burden of establishing that the expatriatory act was performed voluntarily. Nishikawa v. Dulles, supra; Perez v. Brownell, 356 U.S. 44, 61, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958). Loss of citizenship can be a consequence only of conduct which is voluntary. MacKenzie v. Hare, 239 U.S. 299, 311–312, 36 S.Ct. 106, 60 L.Ed. 297 (1915).

After a complete consideration of the record and without reliance upon the relator's sworn statement of January 26, 1961, the pertinent facts are found by this court to be as follows:

■ Marks was born in Milwaukee, Wisconsin, on August 1, 1921. On No-

vember 14, 1951 he was convicted in the Municipal Court, City and County of Milwaukee, Wisconsin, of the offense of carnal knowledge and abuse of a female sixteen years of age. In January 1958 he went to Cuba to join the revolutionary forces of Fidel Castro against the existing regime of Fulgencio Batista. He rose from the rank of private to captain by July 1958. He thereafter sustained an injury while in combat and returned to the United States in November or December 1958 for medical treatment. He was in the United States at the time that Batista's regime was deposed by Castro on January 1, 1959. There was no compulsion exerted upon the relator to return to Cuba. He was, however, a supporter of the agrarian reform movement, and expected that he and other members of the rebel army would be given some of the land which was confiscated by the Castro regime.

Marks returned to Havana about January 5, 1959. Upon his arrival in Cuba he went to see Che Guevara, one of the leading figures of the new government, and slept overnight in the latter's house at La Cabana, a military fortress in Havana. The next day Marks went with Guevara to General Headquarters and was assigned to take over the corps of guards and the security of the Rebel Army at La Cabana. Marks had the rank of captain, and supervised the guards of the revolutionary forces in executing the orders of the tribunals. He acknowledged that after January 1959 he was a member of the Rebel Army, and that men under his direction were also members of the Rebel Army. It is admitted that relator did not obtain authorization for such activity from the Secretary of State or Secretary of Defense.

Relator wore a uniform, olive green in color, and the men under his command in the firing squad wore the same uniform without the insignia of captain which the relator wore. He bore arms and functioned with command responsibility over armed troops, as an integral part of the Rebel Army. About June 1959 he was transferred to various installations, where the men under him performed chiefly guard duty. During July 1959 he gave instructions in the use of weapons at a military police school and he performed the same service at Principe Prison, Havana, from March 1960 until he left Cuba in May 1960. At Principe Prison he commanded an armed guard of 115 men. During the period of his service Marks retained his military rank of captain, wore the insignia, issued commands to men under his jurisdiction, and was himself subject to the official orders of his commanding officer or Chief of Staff. He was paid by the Chief of Staff of the Rebel Army of Cuba, and was the holder of an identity card issued by the director of personnel of the Rebel Army on August 17, 1959 identifying him as a captain of the Rebel Army. In February 1960 a certificate of loss of American citizenship was served upon Marks, which certificate had been previously approved by the United States State Department. In May 1960 the relator, in danger of arrest as a counter-revolutionary, left Cuba. He last entered the United States at El Paso, Texas, in July 1960.

The first issue to be determined is whether the relator's service in the Cuban Rebel Army after January 6, 1959 was voluntary. It has been clearly, unequivocally and convincingly proved that he did so serve. He was in the United States when the Batista regime was overthrown. If he had wanted to have nothing further to do with the Rebel Army he could have remained here in his fatherland. To the contrary he freely returned to Cuba, where he continued in the rank of captain with complete willingness. The statement by the relator, that he was forced to serve because it would have been suicide for him to have refused an order by Che Guevara, is incredible. Mere statements of duress made by the relator cannot eradicate from the record the overwhelming evidence that he served voluntarily. He was not impressed into service; the relator upon his own initiative sought out

Che Guevara and was afforded great hospitality by the latter. From all the circumstances of the case, Marks' claim that he, an American citizen not amenable to military conscription in Cuba, was forced to join the Rebel Army is nothing more than a frivolous assertion with no basis in fact. The relator was a foreign volunteer, and his case differs from those persons who were conscripted into service. Nishikawa v. Dulles, supra; Podea v. Acheson, 179 F.2d 306 (2 Cir. 1950).

That his service was voluntary is clearly shown by the high position the relator had, the type of work he performed, and the grand manner in which he performed it. It is most doubtful that Marks would have become chief executioner unless he desired or sought that position. The absurdity of the relator's claim of duress is further demonstrated by the fact that although he personally saw the American Consul at Havana on frequent occasions from January 1959 until May 1960, at no time did he request personal assistance or asylum from the American Government or its Embassy, nor from other American officials in Cuba. Nor did Marks at any time state to the American Consul, though he could have done so during their frequent meetings, that he had been forced or compelled to enter into or serve in the Cuban Rebel Army. The relator's case is, therefore, completely unlike that of a person whose failure to protest or seek consular aid was due to the fact that he had information that the American Consulate would not aid him. See Nishikawa v. Dulles, 356 U.S. 129, 131, 135, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958). As a result of his responsible position in the Rebel Army, Marks had close connections with the American Consul. He had many extraordinarily ample opportunities to seek American aid, and yet never did he protest or complain of duress.

■ The next problem is whether the Rebel Army after the fall of the Batista regime on January 1, 1959 constituted "the armed forces of a foreign state" within the meaning of Section 349(a) (3) of the Immigration and Nationality Act. The relator's service in the Rebel Army before Castro's rise to power had, of course, no expatriatory consequences because the Rebel Army was at that time merely a revolutionary force with no official status. There is no doubt, however, from the various Cuban laws which were put into evidence and from the testimony of the witnesses, that after Castro came into power in January 1959 the Rebel Army was the only effective military establishment in Cuba. It was de facto the exclusive armed force prior to the passage of laws which directed the absorption of the remnants of the former Cuban Army in a subordinate role until the final dissolution of the former regular Army in October 1959.

As for relator's claim that after the success of the revolution the Rebel Army took on a non-military nature because it did such public projects as reconstruction, reforestation, and clearing of beaches, it must be pointed out that Article 6 of Law #600 of October 16, 1959 explicitly recognized that the Rebel Army continued to be a component of the armed forces of Cuba. It stated that "members of the Rebel Army and other persons at present rendering real and effective service in any of the Armed Forces of the Nation, shall retain their military status." Indeed, it would be difficult to find an armed force on the face of the earth in which some functions of a non-military nature are not performed. In like manner, the fact that Marks performed security and guard functions cannot detract from his status as an active member of an armed force. Comparable functions, though perhaps not as grotesque as those of the relator, are performed by soldiers of the United States and many other nations.

The clear meaning of Congress is not to be perverted and destroyed by the subtlety that the foreign government may have chosen to use its armed forces for other purposes also. The fact remains that the Rebel Army was the effective armed force of Cuba. It has been clearly, convincingly, and unequivocally proven that the Rebel Army in which Marks

actively served was "the armed forces of a foreign state" within the meaning of the Statute.

█ Since voluntary foreign military service has been proved, the element of intent as a factor in expatriation is not critical. Perez v. Brownell, supra; Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287 (1950); Mackenzie v. Hare, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297 (1915). Voluntariness of action is not to be confused with intent to renounce a citizenship. Nothing in the legislative history of Section 349(a) (3) indicates that Congress planned that for a United States citizen to be expatriated thereunder that he must intend to lose his citizenship. As Mr. Justice Frankfurter, writing for the Court in Perez v. Brownell, said:

"Of course, Congress can attach loss of citizenship only as a consequence of conduct engaged in voluntarily. See Mackenzie v. Hare, 239 U.S. 299, 311–312 [36 S.Ct. 106, 108, 60 L.Ed. 297]. But it would be a mockery of this Court's decisions to suggest that a person, in order to lose his citizenship, must intend or desire to do so." 356 U.S. at 61, 78 S.Ct. at 577.

The validity of the constitutional objections interposed by the relator must now be determined.

█ It is urged that Section 349(a) (3) is beyond the power of Congress to enact and is, therefore, unconstitutional. This is not so. The activity covered by Section 349(a) (3) has a direct bearing upon foreign affairs and international relations. Congress' enactment of the section is a legitimate and reasonable exercise of its power to regulate the relations of the United States with foreign countries. In Perez v. Brownell, supra, it was held by the Supreme Court that the power of Congress to regulate foreign relations may reasonably be deemed to include a power to deal with voting by American citizens in foreign political elections, since Congress could find that such activities, because they might give rise to serious international embarrassment, relate to the conduct of foreign relations.

"* * * Experience amply attests that in this day of extensive international travel, rapid communication and widespread use of propaganda, the activities of the citizens of one nation when in another country can easily cause serious embarrassments to the government of their own country as well as to their fellow citizens." 356 U.S. at 59, 78 S.Ct. at 576.

It would indeed seem obvious that service by a United States citizen in the armed forces of another nation, without the authorization of the American Government, carries with it even greater danger of embroiling the international relations of the United States than would mere voting in a foreign election. This court will not deny to Congress the reasonable belief that under the present hazardous international circumstances there is no acceptable alternative to expatriation as a means of avoiding possible embarrassment in and jeopardy to our relations with other nations.

█ Nor is the section in question unconstitutional as a cruel and unusual punishment prohibited by the Eighth Amendment. The present case is unlike Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), in which the Supreme Court declared Section 401(g) of the Nationality Act of 1940 unconstitutional. The Court there explicitly held that the only purpose served by a statute taking away citizenship from a convicted deserter was. to punish the deserter. Id. at 97, 78 S.Ct. 590. In the case at bar, however, expatriation is a means reasonably calculated to the achievement of the legitimate end of protecting the United States' standing in the international community. It is true that the legislation is harmful to the relator; but civil legislation based on voluntary conduct is not converted into a punitive sanction where it represents a bona fide exercise of congressional power "to accomplish some other legiti-

mate governmental purpose." Trop v. Dulles, id. at 96, 78 S.Ct. at 596. Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924); Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898); Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890); Murphy v. Ramsey, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47 (1885). There is nothing on the face of this section or in its legislative history which suggests that Congress had a punitive purpose. The imposition of the disability of expatriation is within the scope of Congress' foreign relations power, and is entirely compatible with a nonpunitive purpose.

Nor does expatriation effect a result so harsh in this case as to be equatable to "cruel and unusual punishment" as that term has been defined. See Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); Howard v. Fleming, 191 U.S. 126, 24 S.Ct. 49, 48 L.Ed. 121 (1903); O'Neil v. Vermont, 144 U.S. 323, 12 S.Ct. 693, 36 L.Ed. 450 (1892); In re Kemmler, 136 U.S. 436, 446, 10 S.Ct. 930, 34 L.Ed. 519 (1890); Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878).

The constitutional objections to the statute having been rejected, the validity of the order of deportation must now be considered.

The relator has been ordered deported upon two legal grounds; he claims that they are incorrect as a matter of law. The first ground upon which the Attorney General's order is based is that at the time of his entry on July 22, 1960 Marks was excludable and therefore deportable because not in possession of an immigrant visa. It is conceded that at the time of his last entry, the relator was not in possession of a visa or any document in lieu thereof, although he intended to remain in the United States indefinitely. Section 212(a) (20) of the Immigration and Nationality Act, 8 U.S.C.A. § 1182(a) (20). A deportation order on this ground was also present in the Perez case, 356 U.S. at 47, 78 S.Ct. 568. The Supreme Court did not resolve the question of Perez' deportability, however, because such was not necessary since that action was for a declaratory judgment. Id. at 65, 78 S.Ct. 568.

■■ I believe that the section providing for deportation for the failure to have documents is not properly applicable to the novel factual pattern involved here. Although Section 356 of the Immigration and Nationality Act, 8 U.S.C.A. § 1488 states that it is the "performance" by a national of an expatriatory act which results in loss of nationality, whether the relator lost his citizenship can only be established finally by a judicial determination. Ng Fung Ho v. White, supra. At the time of his entry into this country on July 22, 1960, the relator could not have obtained the entry documents as an alien without acknowledging an expatriation which had not yet been determined. In fact, at least until the proceeding in the Immigration and Naturalization Service there was no competent determination at all that he was expatriated. Of course, the State Department's notification certificate was not binding on either the Service or the present judicial proceeding. Thus it would appear that, at least until there was a competent determination by the Service that Marks had lost his citizenship, the relator could act in reliance upon his native American birth and enter the United States without violating Section 212(a) (20). Since the relator had a plausible and colorable claim to American citizenship by virtue of his birth in the United States, and since at the time of his entry there had not yet been a competent determination of expatriation, Section 212(a) (20) is not applicable as a ground for deportation.

It is conceded that Marks was convicted in Wisconsin in 1951 of the offense of carnal knowledge and abuse of a female sixteen years of age. This crime has been likened to statutory rape and involves moral turpitude. Bendel v. Nagle, 17 F.2d 719, 57 A.L.R. 1129 (9 Cir. 1927); Pino v. Nicolls, 119 F.Supp. 122, 128 (D.C.Mass.1954), aff'd. 215 F.2d 237

(1 Cir. 1954), rev'd. on other grounds Pino v. Landon, 349 U.S. 901, 75 S.Ct. 576, 99 L.Ed. 1239 (1955). That carnal knowledge is termed an "offense" by Wisconsin is irrelevant. Babouris v. Esperdy, 269 F.2d 621 (2 Cir. 1959), cert. den. 362 U.S. 913, 80 S.Ct. 662, 4 L.Ed.2d 620 (1960); United States v. Flores-Rodriguez, 237 F.2d 405 (2 Cir. 1956). But the respondent is in error in contending that the relator is therefore deportable under Section 212(a) (9) of the Act, 8 U.S.C.A. § 1182(a) (9). The relator does not come within the section. The relator was not a member of an excludable class at the time of his last entry by virtue of such conviction because Section 212(a) (9) applies to "aliens" who have been convicted of such a crime. The relator's conviction occurred in 1951, when he was a citizen of the United States, many years before he became an expatriate. When the statute referred to *"aliens* who have been convicted of a crime involving moral turpitude" (emphasis added), it is inconceivable that Congress meant to cover a person in the position of the relator, an American *by birth* who was later denationalized. The restrictive and harsh standards of Section 212 are explained by the virtually unlimited legislative power with respect to the exclusion of aliens who possess no pre-existing right by birth to be in the United States. When a statute is permissive of two possible constructions, neither of which does violence to the statutory language, that construction which is in accord with humane considerations should be preferred to the construction which leads to unnecessary hardship.

In United States ex rel. Eichenlaub v. Shaughnessy, 338 U.S. 521, 70 S.Ct. 329, 94 L.Ed. 307 (1950), the Supreme Court was confronted with a case involving *naturalized* citizens, whose citizenship was later revoked and cancelled *ab initio* for fraud in the procurement. The naturalized citizens were held to be deportable for convictions sustained during the period of the fraudulent naturalization. But the court withheld passing upon the issue raised in the present case. 338 U.S. at 528 n. 14, 70 S. Ct. 329. In Mangaoang v. Boyd, 205 F.2d 553 (9 Cir. 1953), cert. den. 346 U.S. 876, 74 S.Ct. 129, 98 L.Ed. 384 (1953), it was proposed to deport Mangaoang for membership in the Communist Party, pursuant to 8 U.S.C.A. § 1182(a) (28) (C) ("Aliens who are members of or affiliated with * * * the Communist Party of the United States"). The alleged Communist Party membership occurred while Mangaoang was a national of the United States. Mangaoang terminated his membership and at a later time lost his status as a national of the United States as a result of the proclamation of Philippine independence in 1946. In these circumstances the alien was held not deportable for his alleged previous Communist Party membership. The Court held:

"* * * We think it was not sufficient to prove that the appellant was an alien at the time of his arrest and that he was a member of the Communist Party at some prior date on which he was not shown to have been an alien." 205 F.2d at 555.

I agree with the rationale and interpretation expounded in the Mangaoang decision, and therefore hold the second ground for deportation is also inapplicable in the instant case.

Thus, the relator has been clearly, convincingly, and equivocally proven to have expatriated himself by his voluntary service in the armed forces of a foreign state without the authorization of the Secretary of Defense and Secretary of State. Since he neither requested nor received Cuban citizenship, he is a stateless alien. He is, however, not deportable since neither of the grounds upon which the order of deportation is based is applicable as heretofore found.

The proposed continued detention of the relator is, therefore, unlawful.

The above shall constitute my Findings of Fact and Conclusions of Law.

Writ granted.

It is so ordered.